Thomas J. MORIARTY, Trustee, on behalf of the Trustees of the Local Union No. 727, Local 727 I.B.T. Pension Trust Fund and Local 727 Trustees of the Teamsters Local Union 727 Health and Welfare Trust, Plaintiffs–Appellees,

v.

GLUECKERT FUNERAL HOME, LTD., Defendant–Appellant.

Nos. 97–4239, 98–2131.

United States Court of Appeals, Seventh Circuit.

Argued May 29, 1998.

Decided Sept. 2, 1998.

Charles Orlove, Karen I. Engelhardt (argued), Jacobs, Burns, Sugarman, Orlove & Stanton, Chicago, IL, for Plaintiffs–Appellees in No. 97–4239. Karen I. Engelhardt (argued), Jacobs, Burns, Sugarman, Orlove & Stanton, Chicago, IL, for Plaintiffs–Appellees in No. 98–2131.

Kenneth R. Dolin (argued), Gerard Andrew McInnis, Jenner & Block, Chicago, IL, for Defendant–Appellant.

Before CUMMINGS, RIPPLE and EVANS, Circuit Judges.

RIPPLE, Circuit Judge.

Thomas J. Moriarty ("Moriarty"), in his capacity as Trustee for the Teamsters Local Union No. 727 Pension Trust and the Teamsters Local Union No. 727 Health and Welfare Trust (the "Funds"), filed suit against Glueckert Funeral Home, Ltd. ("GFH") seeking to collect employer contributions to the Funds. The action was brought under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and § 515 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132. After a bench

trial, the district court entered judgment in favor of the Funds [1] for unpaid contributions, liquidated damages, audit costs and interest in the amount of $366,423.25. GFH appeals, and, for the reasons set forth in the following opinion, we reverse the judgment of the district court and remand for further proceedings in light of this opinion.

# I

# BACKGROUND

## A. Facts

Glueckert Funeral Home, Ltd. operates a funeral home in Arlington Heights, Illinois. John Glueckert, Sr., ("Glueckert") is GFH's President, founder and majority shareholder.[2] Glueckert runs GFH with his son, John, Jr., who is, like his father, a licensed funeral director and embalmer. In March 1989, GFH joined the Funeral Directors Services Association ("FDSA"), an association of approximately 250 funeral homes and related businesses. The FDSA, among its other activities, represents employers in the Chicago-area funeral home industry in collective bargaining negotiations with the International Brotherhood of Teamsters, Local No. 727 (the "Union").[3] The Funds in this case are third-party beneficiaries of collective bargaining agreements ("CBAs") negotiated between the FDSA and the Union. The essence of the dispute before us is whether GFH, by virtue of joining the FDSA and continuing its membership in the association for several years, manifested its intent unequivocally to authorize the FDSA to act on its behalf in collective bargaining negotia-

tions and to bind GFH to the resulting agreements. If GFH was so bound, then it was required to contribute to the Funds pursuant to the terms of certain CBAs. We therefore review the circumstances surrounding GFH's membership in the FDSA.

In 1988, Glueckert began to consider joining an association of funeral homes in order to remain current on business and legal developments affecting his business. Glueckert's testimony at trial indicates that he was concerned with staying abreast of legal issues in light of the increasingly regulated nature of his business. In response to GFH's inquiry about membership in the FDSA, Thomas Moriarty, the Executive Director of the FDSA, sent GFH an introductory letter on July 7, 1988, outlining the services FDSA provides to its members. That letter indicates that the FDSA is involved in monitoring government regulations affecting the funeral industry, supplying insurance for its members and providing continuing education-type programs for its members. Moreover, a brochure accompanying the letter stating "What FDSA Can Do For You" further described the association's services and activities.[4] The trial testimony of Moriarty established that it is not mandatory for a member of the FDSA to participate in any of these services or activities. These introductory materials sent to GFH are devoid of any mention of the Union or FDSA's role as a representative of the funeral homes in collective bargaining activities with the Union. However, also enclosed with the brochure and letter were six months of FDSA newslet-

1. The liability and damages aspects of the trial were bifurcated. The district court's opinion with respect to the liability phase of the trial is reported. *See Moriarty v. Glueckert Funeral Home, Ltd.*, 967 F.Supp. 1038 (N.D.Ill.1997).

2. Glueckert purchased an established funeral home in 1970 and later incorporated the venture in 1975. The funeral home moved to its current location in 1987. Glueckert owns 99% of the company's stock.

3. The full name of the Union is: The Auto Livery Chauffeurs, Embalmers, Funeral Directors, Apprentices, Ambulance Drivers and Helpers, Taxicab Drivers, Miscellaneous Garage Employees, Car Washers, Greasers, Polishers and Wash Rack Attendants Union, Local No. 727, I.B.T. R.40, Ex.A. para. 1.

4. This brochure referenced, inter alia, the following aspects of the FDSA operation: Information Central ("a clearinghouse of funeral industry related information ... as close as your telephone"), Educational Meetings and Workshops, Government Relations, Insurance Programs, Programming Assistance, Special Reports ("on what is happening in funeral service"), Legal ("protection of the franchise of the funeral director and the rights of his clients"), Legislative ("watchdog on legislative matters"), Monthly Newsletter, Fun, Travel, and Other Services. R.92, Ex.1 at 4. The brochure also states, under the heading, "What You Can Do For Yourself" that the FDSA will allow members to be "Better Businessmen" by "keeping abreast of current developments and the opportunity to meet and relate to fellow funeral directors." *Id.*

ters provided by Moriarty to give Glueckert an idea of the association's recent activities. Two of those newsletters contained references to the Union and the FDSA's role as a representative of the funeral directors in collective bargaining.[5] However, those references do not indicate that all members of the FDSA are purportedly bound by the results of those negotiations.

Glueckert and his son John, Jr. also met with Moriarty to discuss the possibility of joining the FDSA. At this meeting, Moriarty reportedly discussed the FDSA's activities and the benefits of membership in the organization. In addition, Glueckert asked Moriarty some questions regarding the details of GFH's membership in the FDSA. One question he had pertained to the color of the hearse that GFH used (blue); he was concerned that FDSA membership could require him to use a gray hearse. In addition, he asked whether he had to become a member of the Union if he joined the FDSA. Moriarty told him that he did not.[6] This question and answer are interpreted differently by the parties. The Funds' position, accepted by the district court, is that Glueckert's question

indicated that GFH was aware that the FDSA conducted collective bargaining activities. Moreover, the Funds note that Moriarty's answer was true because the principal owner of a funeral home generally is not required to be in the Union.[7] In contrast, GFH views the exchange as an indication that membership in the FDSA did not necessarily entail involvement with the Union. Despite the disagreement over this statement, it is undisputed that nothing said at the meeting indicated that FDSA's alleged principal activity[8] was collective bargaining or that, by joining the FDSA, GFH agreed to be bound by the terms of CBAs negotiated by the FDSA. GFH submits that such information regarding membership in the FDSA would have been significant to it because none of GFH's employees were, or ever have been, members of the Union. In addition, such a requirement would have been inconsistent with Glueckert's knowledge of other funeral homes that operated without union employees but were members of the FDSA.[9]

Because the FDSA would enable him to keep current on regulatory and other matters, testified Glueckert, GFH decided to ap-

5. In one of the newsletters, members were notified that "[u]nder the terms of the agreements with Local Union No. 727 and Local No. 73, new wage rates for chauffeu[r]s and cleaning personnel become effective ... March 1, 1998." R.92, Ex.1 at 10. Another reference to the Union was made in another newsletter, indicating that "[y]our Embalmer Negotiating team continues to meet with representatives of Teamster Local Union No. 727 on a new wage agreement, but no progress has been made." Id. at 27.

6. The context of the discussion in which this question arose is not very clear, probably because by the time trial occurred in 1996, the parties had difficulty recalling the exact details of the conversation held in 1988 or 1989 (it is also not clear exactly when this meeting occurred). In fact, the accounts differed with respect to what was said at the meeting. John, Jr. testified that the question Glueckert asked was whether GFH had to become a Union firm if it joined the FDSA. The district court credited Glueckert's testimony and found that he had asked whether he had to join the Union.

7. Although this may be an arrangement worked out between the FDSA and the Union, that arrangement may not be consistent with the language of the CBAs. See Moriarty v. Svec, 994 F.Supp. 963, 966–67 (N.D.Ill.1998) (reviewing Moriarty's testimony in this case, but still finding that the principal owner of a funeral home is an

"employee" within the meaning of the CBA at issue).

8. The parties have engaged in some wrangling over what the "principal activity" of the FDSA is. Moriarty suggested at trial that, in his view, the collective bargaining activities were the principal function of the FDSA. However, as we noted above, mention of that activity is conspicuously absent in the promotional materials provided by the FDSA. Moreover, it appears that Moriarty did not describe these activities or his position as Trustee of the Funds in his meeting with Glueckert. Additionally, prior FDSA presidents testified that there were many principal activities of the association. The district court declined to take a definitive position on the issue and found that collective bargaining was one of the principal activities of the FDSA.

9. It is undisputed that not all members of the FDSA are required to make contributions to the Funds pursuant to the terms of the CBAs negotiated by the FDSA. The Funds acknowledge that those members of the FDSA that do not have employees doing work covered under the CBAs are not expected to contribute to the Funds. However, the Funds maintain, and GFH does not dispute, that GFH had employees performing covered work during its membership in the FDSA.

ply for membership in the FDSA; that membership was approved on March 22, 1989. GFH was a member of the association until September 1994. During GFH's membership in the association, there were additional indications that FDSA was involved in collective bargaining activities. For example, GFH received the monthly FDSA newsletter. Some newsletters contained references to labor negotiations conducted by FDSA. In addition, John, Jr. ultimately became a member of the FDSA's Board of Directors in February or March 1994. As a director, John, Jr. was present at a July 20, 1994, meeting in which labor negotiations were discussed.[10] In addition to these references to the FDSA's collective bargaining activities, all members were sent copies of the labor agreements themselves. The cover letters to those agreements indicate that the agreements apply to "every member of the Association." [11]

Despite these indications and the district court's finding to the contrary, however, GFH maintains that it was unaware throughout its membership that, by virtue of its membership, it was necessarily bound by the CBAs negotiated by the FDSA with the Union. The Funds note that, when GFH signed its membership application, it agreed to be bound by the FDSA's Constitution, By-laws, Rules and Regulations. However, no reference to collective bargaining activities can be found in the Constitution or the By-laws.[12] In addition, GFH never signed any document authorizing the FDSA to negotiate on its behalf.

Although Glueckert attended membership meetings, no discussion of the Union or collective bargaining occurred at any of those meetings. Moreover, although John, Jr. attended meetings in 1994 at which labor negotiations were discussed, it was not clear from those meetings that all members were bound by those negotiations. In addition to the lack of evidence indicating that the FDSA made GFH aware of its position that GFH would be bound to the CBAs by virtue of its membership in the association, GFH points to facts surrounding its behavior that indicate that it never understood itself to be bound by the CBAs. For example, GFH notes that it has never applied the terms and conditions of employment in any CBA to its employees. In addition, GFH has paid for GFH-obtained health insurance and profit sharing plans for its employees throughout its membership in the FDSA—actions inconsistent with an understanding that such benefits were available to the employees under the CBAs. When GFH employees attended continuing education programs co-sponsored by the FDSA and the Union, the employees paid the enrollment fee required for non-Union members. Finally, as soon as GFH learned, in September 1994, that the FDSA's position was that all members were bound by the CBAs it negotiated, GFH immediately resigned from the association and John, Jr. resigned as a member of the Board.

The Union was aware that GFH was a member of the FDSA as of January 1990, when GFH appeared in the FDSA's annual reference guide, copies of which were sent to the Union. Although GFH never remitted any contributions, dues, initiation fees or other monies required by the CBAs, the Union did not contact GFH about collecting any

---

**10.** The Funds assert that John, Jr. also intentionally missed a July 1, 1994, meeting "because he knew the purpose of the meeting was to discuss matters relating to the Union." Appellee's Br. at 7 (citing R.40, Statement of Uncontested Facts para. 30). However, although the source cited for this statement indicates that John, Jr. was aware of the purpose of the meeting, there is no support in that record for the conclusion that he obtained his "excused absence" from the meeting because that was the planned topic of discussion.

**11.** The labor agreements themselves provide that an employer-member of the FDSA is obligated to contribute to the Funds for work performed by employees that is covered under the CBAs. More-

over, GFH employees, if otherwise eligible, are entitled to file claims for health and welfare benefits and pension credits as a result of GFH's FDSA membership. Consequently, the crucial question in this case is whether GFH is properly deemed a party to the CBA by virtue of its membership in the FDSA. If so, GFH is required to pay contributions to the funds.

**12.** Such references could be found prior to 1981, but they were removed and placed in the Official Statements of Policy. Those Statements permit the President of the FDSA to appoint a committee representing the membership to enter into labor negotiations and to enter into CBAs subject to membership approval. *See Moriarty*, 967 F.Supp. at 1043.

such fee or contribution. The only contact GFH had with the Union was in the summer of 1994 when two representatives of the Union went to the funeral home and asked whether GFH had a Union driver operating the hearse; the Union representatives apparently learned that employees of GFH were performing work covered by the CBAs. The Funds, in turn, learned from the Union that GFH had such employees and therefore that contributions for those employees were required.[13] Thomas Moriarty, in his capacity as Trustee of the Funds, subsequently brought this action to recover the contributions to the Funds required by the CBAs.

### B. Proceedings in the District Court

The district court conducted a bench trial to determine whether GFH was obligated to pay the Funds contributions for GFH's employees who performed covered work during its membership in the FDSA. In the district court's view, GFH's liability for the obligations imposed under the CBAs was a matter of agency law. Therefore, the district court sought to determine whether GFH had authorized the FDSA to enter into such binding agreements on its behalf. The court held that GFH had imparted implied actual authority upon the FDSA to bind GFH as its bargaining agent in the CBAs. The court concluded that the facts and circumstances of the case, including GFH's receipt of the various correspondence referring to the collective bargaining activities, gave "rise to the reasonable implication that [GFH] granted [FDSA] authority to bargain and enter into CBAs on its behalf with [the] Union." *Moriarty v. Glueckert Funeral Home, Ltd.*, 967 F.Supp. 1038, 1049 (N.D.Ill.1997). Alternatively, the district court also held that the FDSA had apparent authority to bind GFH and that the Funds reasonably believed that the FDSA had the authority to negotiate on behalf of all of its employer members. In light of its finding that an agency relationship existed, the court held that GFH had violated its obligations to the Funds by failing to pay the contributions required under the CBAs. In addition, the court found that the violation was ongoing because contributions were required under the terms of the labor agreements even after GFH resigned from the FDSA. Having concluded that GFH was liable for the contributions, the court subsequently entered judgment in favor of the Funds in the amount of $366,423.25.

## II

## DISCUSSION

### A.

In this appeal, GFH's primary focus is the district court's finding that GFH was obligated under the terms of the CBAs negotiated between the FDSA and the Union to remit payments on behalf of its workers to the Funds. GFH argues that the district court applied the wrong legal standard in the inquiry and that, even if agency principles appropriately govern this case, the district court clearly erred in its determination that GFH authorized the FDSA either impliedly or apparently to bind it in negotiations with the Union.

We generally view determinations regarding the existence and scope of an agency relationship as questions of fact. *See Anetsberger v. Metropolitan Life Ins. Co.*, 14 F.3d 1226, 1234 (7th Cir.1994) (applying Illinois law). Consequently, a court's finding that an agency relationship exists is generally reviewed for clear error. *See Chemtool, Inc. v. Lubrication Techs., Inc.*, 148 F.3d 742, 744–45 (7th Cir.1998) ("We review the trial court's findings of fact for clear error." (citing Fed.R.Civ.P. 52(a))). However, when the district court employs the wrong legal standard in assessing the facts, its findings are clearly erroneous. *Cf. id.* at 745 (stating that whether the district court applied the correct test for agency under Illinois law is "a question of law to be reviewed de novo").

---

13. The Funds traditionally have relied on voluntary employer cooperation for payments due under CBAs because they have few resources to police compliance with the CBAs. The Funds usually learn of employers required to pay contributions when the employers call the Funds; when that occurs, the Funds inquire how many employees are performing covered work and a bill is then sent to the employer. Less frequently, the Funds learn of employers with employees doing covered work through the process that occurred here—visits to the employer by Union agents.

## B.

### 1.

■ The circumstances under which an employer may be bound, through its involvement with a multi-employer association, to collective bargaining agreements negotiated between the association and a union has been addressed by numerous courts. This issue usually arises in the context of a review of decisions of the NLRB.[14] When the issue arises in a suit for enforcement of the labor contract for contributions to the funds that are third-party beneficiaries of the labor contract, however, the question is one exclusively for the courts. *See Martin v. Garman Constr. Co.*, 945 F.2d 1000, 1003–04 (7th Cir. 1991) (holding that ERISA claims brought for collection of contributions are in the exclusive jurisdiction of the federal courts), *cert. denied*, 502 U.S. 1122, 112 S.Ct. 1244, 117 L.Ed.2d 476 (1992). In this latter context, the governing legal standard has been articulated succinctly by Judge Winter of the Second Circuit in *Trustees of the UIU Health and Welfare Fund v. New York Flame Proofing Co.*, 828 F.2d 79, 83 (2d Cir.1987). In that case, the Second Circuit adopted the "well-established" approach employed by the NLRB when determining whether a member of a multi-employer organization is bound by the collective bargaining contract negotiated by the association on behalf of its members: " 'The test is whether the employer members of the group have indicated from the outset an unequivocal intention to be bound by group action in collective bargaining, and whether the union, being informed of the delegation of bargaining authority to the group, has assented and entered into negotiations with the group representative.' " *Id.* (quoting *NLRB v. Beckham, Inc.*, 564 F.2d 190, 192 (5th Cir.1977)); *see also Charles D. Bonanno Linen Serv., Inc. v. NLRB*, 454 U.S. 404, 419–20, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982) (Stevens, J., concurring) (quoting

same test and stating that "[a]bsent such an unequivocal commitment to be bound by group action, an employer is free to withdraw from group negotiation at any time, or simply to reject the terms of the final group contract").

In this case, the relevant portion of this inquiry is whether GFH manifested an "unequivocal intention to be bound" by the FDSA's collective bargaining activities. In its otherwise comprehensive analysis, the district court did not articulate this test as the governing legal standard; instead, it relied entirely on general agency principles to determine whether GFH was bound by the CBAs negotiated by the FDSA. Invocation of agency principles is not, in itself, inconsistent with the case law. Indeed, in *New York Flame*, the Second Circuit determined that the " 'unequivocal intention' test does not render other rules of the law of agency, and in particular the doctrine of apparent authority, inapplicable." *New York Flame*, 828 F.2d at 83 (citing *NLRB v. Johnson Sheet Metal, Inc.*, 442 F.2d 1056, 1060 (10th Cir. 1971)). The Tenth Circuit also has confirmed that "general rules of agency and particularly the rules of apparent authority" can be used in determining whether the employer gave "unequivocal consent to the bargaining unit." *Bennion v. NLRB*, 764 F.2d 739, 743 (10th Cir.1985). Similarly, the District of Columbia Circuit has noted that an "unequivocal intention to be bound by group action need not be expressed in a written agreement." *General Teamsters Local Union No. 174 v. NLRB*, 723 F.2d 966, 972 (D.C.Cir.1983). Consequently, that court explained that a "party may rely on apparent, as well as express, delegation of authority in consenting to engage in joint bargaining" and that the "unequivocal intention [also] can be inferred, in part, from a course of conduct." *Id.* (internal quotations omitted).

■ We pause to state the basic law of agency that is a crucial component in our analysis.[15] An agent's authority may be ac-

---

14. *See, e.g., NLRB v. Beckham, Inc.*, 564 F.2d 190, 192 (5th Cir.1977); *see also Crane Sheet Metal, Inc. v. NLRB*, 675 F.2d 256, 259 (10th Cir.1982) (stating that the "Board has formulated a court-approved test to determine whether an employer has delegated to a multi-employer unit apparent authority to negotiate a collective bargaining agreement binding on the employer" and reciting the test as explicated in *Beckham*).

15. Because this case arises under ERISA and the LMRA, we look to the federal common law of agency to supply the governing principles of law. *See Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 456–57, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) (holding that substantive law to be applied to suits under § 301 of the LMRA is "federal law"); *Sullivan v. Cox*, 78 F.3d 322, 326 (7th Cir.1996) ("Courts must therefore fashion

tual or apparent, *see generally* Restatement (Second) of Agency §§ 7–8; if it is actual, it may be express or implied, *see id.* § 7 cmt. c. Implied authority is that authority which is inherent in an agent's position and is, simply, actual authority proved through circumstantial evidence. Actual authority "to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." *Id.* § 26. In contrast, "apparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Id.* § 27. In other words, apparent authority is created by the same method as that which creates actual authority, except that the manifestation of the principal is to the third person rather than to the agent. *Cf. New York Flame,* 828 F.2d at 83 ("The doctrine of apparent authority comes into play when a party ... reasonably believes that another party ... has delegated authority to enter into an agreement on its behalf to an agent....").

■ However, although general principles of agency law are a necessary part of the appropriate inquiry, we do not believe that such principles, standing alone and without reference to the "unequivocal intention to

be bound" principle, are an adequate tool for judicial analysis in the multi-employer association context.[16] Certainly, the framework of agency law, especially the concepts of implied actual or apparent authority, will provide, as a practical matter, the basic matrix of the court's analysis. Nevertheless, the "unequivocal intent to be bound" principle must inform that analysis by requiring substantially more factual precision than might be true in other agency situations. It requires that certainty by focusing the judicial inquiry on factors that are peculiarly relevant to determining whether an employer member of a multi-employer organization can be said to have consented to be bound by the contract negotiated by the association. Our task, therefore, is to determine whether the district court's focus on the relevant factors was sufficiently precise to justify affirmance despite the court's failure to articulate the "unequivocal intent to be bound" principle.

In determining whether an employer has manifested "an unequivocal intent to be bound," the courts have relied on several factors. In *New York Flame,* our colleagues in the Second Circuit placed great emphasis on the activities of the employer organization and inquired as to whether the negotiation of collective bargaining agreements was a principal or sole activity in which it engaged. *See* 828 F.2d at 81, 83. There appears to be a broad consensus that mere membership in such an organization is not enough to bind

---

federal common law to govern ERISA suits in an effort to promote uniformity, turning to state law only when consistent with the policies underlying ERISA."); *see also Anderson v. International Union, United Plant Guard Workers of Am.,* 150 F.3d 590, 592–93 (6th Cir.1998) (examining agency issue under ERISA and stating that "we are guided by the law of agency as developed and interpreted as a matter of federal common law"); *Taylor v. Peoples Natural Gas Co.,* 49 F.3d 982, 988 (3d Cir.1995) (assessing scope of agent's authority to make representations in ERISA case and stating that "[i]n making this determination, we are governed by the law of agency, as developed and interpreted as a matter of federal common law" (collecting cases)). Moreover, in developing the federal law of agency, courts have relied on the Restatement of Agency as a valuable source for those general agency principles. *See Cilecek v. Inova Health Sys. Servs.,* 115 F.3d 256, 259–60 (4th Cir.1997) (stating, in context of attempting to "establish a uniform nationwide application of" certain federal statutory terms

"for [the] purpose of applying federal statutes" that "we rely on 'the *general* common law of agency' and not the law of the particular state," and explaining that to determine "the general common law of agency, the [Supreme] Court notes that it has traditionally looked to sources such as the Restatement of Agency" (citing *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 752 n. 31, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989))), *cert. denied,* —— U.S. ——, 118 S.Ct. 694, 139 L.Ed.2d 639 (1998); *see also Anderson,* 150 F.3d at 593 (relying on Restatement as source of law for apparent authority principles).

**16.** *Cf. Crane Sheet Metal, Inc. v. NLRB,* 675 F.2d 256, 259 (10th Cir.1982) (explaining that the test for existence of apparent authority in this context *is* the unequivocal intent to be bound inquiry); *General Teamsters,* 723 F.2d at 972 ("It is ... appropriate ... to look at the particular facts of each case to determine whether the parties intended to be bound by group action.").

the individual employer to the terms of the agreement negotiated by the association. *See id.* at 83; *Crane Sheet Metal, Inc. v. NLRB,* 675 F.2d 256, 259 n. 9 (10th Cir. 1982); *Alston v. Kay East Parking Corp.,* 988 F.Supp. 718, 720 (S.D.N.Y.1997). However, when an association that has a long-standing and universally known and observed custom that all of its members are bound by the association's collective bargaining agreements, "membership in that organization does constitute an unequivocal statement as to its actual authority to bind the new member." *New York Flame,* 828 F.2d at 83. Absent such a custom, the courts have looked to other factors to determine whether the individual employer had the "unequivocal intention to be bound" by the agreement. Specifically, the courts have inquired into whether the individual member participated in the collective bargaining process. *See id.* at 81; *Beckham,* 564 F.2d at 194. Close monitoring of collective bargaining negotiations has also been viewed as relevant and probative evidence of the employer's intent. *See New York Flame,* 828 F.2d at 81; *see also General Teamsters,* 723 F.2d at 972 (noting that the requisite unequivocal intent can be inferred, in part, from a "course of conduct"). On the other hand, the "correlative standard" for excluding a particular employer from the group is "evidence of an intent to pursue an individual course of action with respect to labor relations." *New York Flame,* 828 F.2d at 83 (internal quotations omitted). An employer's intent can also be established, according to the case law, from the employer's conduct in adhering to, or ostensibly adhering to, the terms of the collective bargaining agreement. For instance, if an employer has contributed to a fund or has filed reports declaring that it has done so even if it has not, such evidence may be considered in determining its intent to be bound by the agreement. *See id.* at 82.

### 2.

■ Upon examination of the record, we cannot say that, despite its failure to articulate the appropriate standard, the district court nevertheless made the appropriate factual inquiry into the intent, objectively measured, of GFH to be bound by the terms of the association's collective bargaining agreement. Here, although the district court explicitly found that collective bargaining is a principal activity of the association, it also deemed that factor "neither useful nor critical" to its analysis. *Moriarty,* 967 F.Supp. at 1040. Indeed, it explicitly rejected Mr. Moriarty's contention that "Glueckert was bound by reason of some all-pervasive uniform understanding, whether industry-wide or otherwise, as to the nature and extent of Association's collective bargaining activities." *Id.* at 1047.[17] Instead, the district court chose to rely "solely on the specific facts that are applicable to the Glueckert–Association relationship." *Id.* at 1048. It then described, and the record no doubt supports the conclusion, that GFH was aware of the collective bargaining activities of the association and that, indeed, GFH made a concerted, ostrich-like effort not to become further knowledgeable about this aspect of the association's business. That effort at avoidance is susceptible to different interpretations and the district court was entitled, if it chose to do so, to decide that it was relevant and probative of GFH's knowledge that the collective bargaining agreements were binding upon them. Nevertheless, when the inquiry is more precisely narrowed to the issue of whether GFH understood that it was bound by the agreements, the district court notably did not make many of the other inquiries that our review of the case law indicates other courts have deemed to be highly relevant. The court did not treat, for instance, the issue of whether GFH ever actually took part in the collective bargaining process. Nor did the district court deal with the fact that, although it found that there are a good number of member establishments that do not have covered employees, neither the FDSA nor the Union maintained regular records that indicated whether there were covered employees at GFH.

---

**17.** The court noted that the record lacked proof that the association's promotional literature made reference to the collective bargaining activities of the FDSA and deemed it unnecessary for its analysis to speculate as to why such a description had been omitted. *See Moriarty,* 967 F.Supp. at 1040 n. 3.

More importantly, the district court did not come to grips with the significance of its finding that GFH actually maintained its own plans in lieu of those provided by the funds. This maintenance of individual funds by GFH comes close to the "correlative standard," set forth in *New York Flame* of evidence of an intent to pursue an individual course of action with respect to labor relations. *See* 828 F.2d at 83. Similarly, it appears that GFH resigned from the FDSA as soon as it learned of the FDSA's belief that GFH was bound by the terms of the CBAs. Finally, the district court's analysis apparently gave little weight to the fact that GFH had never made contributions or declared that it had made them and thus lulled the Funds into the belief that GFH believed itself bound by the collective bargaining agreements.

Under these circumstances, we cannot say that the district court's failure to employ the appropriate standard for assessing the facts of record did not have a prejudicial effect on its decision. Accordingly, the case must be remanded for a new trial under the standard employed in *New York Flame*, the standard which we have articulated today.

### Conclusion

The district court in this case failed to consider whether GFH had manifested an unequivocal intent to be bound by the collective bargaining negotiations conducted by the FDSA. This failure resulted in a misapprehension of the governing legal standard and a consequent incorrect application of that standard to the facts of this case. For these reasons, we reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.

In light of our decision today, the judgment brought to us in the successive appeal, No. 982131, challenging the award of attorneys' fees in this case, is vacated. The case is remanded to the district court for proceedings consistent with this opinion.

Glueckert may recover its costs in both appeals.

No. 97–4239 REVERSED and REMANDED.

No. 98–2131 VACATED and REMANDED.