Thomas J. MORIARTY, Trustee, on Behalf of the TRUSTEES OF THE LOCAL UNION NO. 727 I.B.T. PENSION TRUST AND TRUSTEES OF THE TEAMSTERS LOCAL UNION NO. 727 HEALTH AND WELFARE TRUST, Plaintiff,

v.

HILLS FUNERAL HOME, LTD., et al., Defendants.

No. 98 C 773.

United States District Court, N.D. Illinois, Eastern Division.

March 21, 2000.

---

William Leathem, Jacobs, Burns, Orlov, Stanton & Hernandez, Chicago, IL, for plaintiff.

James P. Nally, James E. Mahoney, Griffith & Jacobson, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Thomas J. Moriarty as Trustee ("Moriarty") has sued two defendants on behalf of the Local Union No. 727 Pension Trust and the Teamsters Local Union No. 727 Health and Welfare Trust (collectively "Funds") pursuant to the Labor Management Relations Act (29 U.S.C. § 185) and the Employee Retirement Income Security Act of 1974 ("ERISA," 29 U.S.C. § 1132(a)(3)), seeking to recover employer contributions allegedly owed to Funds. Moriarty and defendant Hills Funeral Home, Ltd. ("Hills") have filed cross-motions for summary judgment as to liability pursuant to Fed.R.Civ.P. ("Rule") 56. Moriarty has also filed a Rule 56 motion as to liability on his claims against defendant George Pepper ("Pepper").

In compliance with this District Court's LR 56.1, adopted to implement Rule 56 by facilitating the identification of the presence or absence of genuine issues of material fact, the litigants have filed the factual statements and responses called for by that LR.[1] They have also completed the required briefing on the motion and cross-motions. For the reasons set forth in this memorandum opinion and order, both of Moriarty's motions are granted, while Hills' motion is denied.

### Summary Judgment Principles

Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (*St. Louis N. Joint Venture v. P & L Enters., Inc.*, 116 F.3d 262, 265 n. 2 (7th Cir.1997)). Where as in the Moriarty–Hills duel cross-motions for summary judgment are involved, it is necessary to adopt a dual perspective—one that this Court has often described as Janus-like—that sometimes involves the denial of both motions. That has not occurred here, because even from a pro-Hills perspective Moriarty's Rule 56 motion succeeds.

### Facts

#### Pepper's Funeral Home Operation

Funds are employee benefit plans that are third-party beneficiaries of collective bargaining agreements ("CBAs") entered into between the Funeral Directors Services Association of Greater Chicago ("Association") and the Auto Livery

---

1. Because resolution of Moriarty's Rule 56 motion against Pepper requires the adoption of a perspective crediting the latter's version of any disputed facts (if supported by evidence), this opinion most frequently cites to "Pepper Stmt. ¶ —." For the same reason in connection with Moriarty's ultimate success on the Moriarty–Hills cross-motions, there are relevant citations to "Hills Stmt. ¶ —." Where Pepper or Hills has failed to respond to Moriarty's version (so that the latter is deemed admitted pursuant to LR 56.1(b)(3)(B)), or where the Moriarty version controls for any other reason, that version will be cited "Moriarty Stmt. ¶ —." Finally, because Pepper did not respond to any of the factual assertions in Moriarty Stmt. ¶¶ 129–92, this opinion cites only to the Hills Stmt. as to those paragraphs.

Chauffeurs, Embalmers, Funeral Directors, Apprentices, Ambulance Drivers and Helpers, Taxicab Drivers, Miscellaneous Garage Employees, Car Washers, Greasers, Polishers and Wash Rack Attendants Union, Local No. 727, I.B.T. ("Union") (Pepper Stmt. ¶¶ 28, 31). Moriarty is a trustee of both Funds (*id.* ¶ 30).

Association is a multi-employer organization of funeral homes located in the Chicago metropolitan area (*id.* ¶ 40). Among other things, it negotiates labor agreements for its members and also provides them with a pre-need funeral arrangement trust fund and continuing education programs (*id.* ¶¶ 43–44). Association communicates with its members through a monthly newsletter (*id.* ¶ 45) that provides members with a variety of information, including information about labor relations (*id.* ¶ 46). Approximately 80% of the newsletters contain information about Association's relationship with Union (*id.* ¶ 50).

Pepper operated a funeral home business in Palos Hills, Illinois from approximately February 1979 to January 1998 (*id.* ¶¶ 32–35). From 1979–82 Pepper operated his business under the name Olympic Hill Chapel (*id.* ¶ 33). Then from 1982–98 Pepper operated his business as Hills Funeral Home (*id.* ¶¶ 33–34).[2]

In December 1978 Moriarty had sent Pepper an application for membership in Association in connection with his contemplated acquisition of the funeral home business (*id.* ¶ 54). Pepper signed and returned the application, which stated in part (*id.* ¶¶ 55–56):

> [I] agree[ ], if elected to membership, to abide by and be bound by the provisions of the Constitution, By–Laws, Rules and Regulations of the Association.

One of the then-existing provisions of Association's Constitution (its Art. X, § 2) read (*id.* ¶ 59):

> *Labor Negotiations.* The Association, through action by the General Executive Board, shall authorize the President to appoint a committee to represent the members of the Association in labor negotiations or any dispute or grievance which may arise from such labor negotiations and to enter into such agreements as a result of the negotiations, subject to the approval of the membership.

In February 1979 Pepper was elected to Association membership (*id.* ¶ 57).

Association negotiates CBAs with Union through a negotiating committee (*id.* ¶ 70). Those CBAs require Association members to whom they apply "to contribute to the Funds for work performed by bargaining-unit employees, including amounts per month for each funeral director and embalmer and driver" (*id.* ¶ 67; Moriarty Stmt. ¶ 67). Association does not require its members to delegate on an individualized basis such authority for Association to bargain or to ratify negotiated contracts—instead, consistently with the Association Constitution, Association's members as a body ratify the contracts at special membership meetings (Pepper Stmt. ¶¶ 74, 77). As an Association member, Pepper was consistently notified of those special membership meetings, but he chose not to attend them (*id.* ¶¶ 78–80).

After a CBA is approved, Association distributes a copy of the contract to each member with a cover letter that says "[t]he Agreement applies to every member of the Association" (*id.* ¶ 82). Pepper received copies of the approved CBAs and the cover letters from Association (*id.* ¶ 83). In addition he received copies of Association's monthly newsletters, but he did not read them (Moriarty Stmt. Ex. O, Pepper Dep. 70).

---

2. Because Pepper operated as a sole proprietor using the Hills name, this opinion's references to him by his own name while speaking of the acquiring corporation as "Hills" should cause no confusion.

Four people worked for Pepper at Hills Funeral Home: Greg Peppas, Peter Talso, Jovita Simmermon and John Schultz (Moriarty Stmt. ¶ 176). Those employees performed covered bargaining unit work as defined by the CBAs (Pepper Stmt. ¶ 69). Pepper did not have a health or pension plan for any of them (*id.* ¶ 92).

In January 1998 Pepper submitted his resignation to Association (*id.* ¶ 64), and on February 18, 1998 it approved his resignation (*id.* ¶ 65). At no time before that date had Pepper told Association that it was not authorized to bargain on his behalf, nor did he tell Union that Association was not authorized to do so (*id.* ¶¶ 90–91).

*Funds' Audit of Pepper's Funeral Home*

On July 25, 1997 Funds' auditor, Thomas Havey LLP, notified Pepper that Funds wanted to conduct an audit of the Hills Funeral Home payroll records (*id.* ¶ 122). On August 14, 1997 Havey conducted the audit covering the period from January 1, 1990 through June 30, 1997 (*id.* ¶ 124). On October 22, 1997 Havey issued his audit report, which found that Pepper owed $38,575.53 to the Pension Fund and $65,780.24 to the Health and Welfare Fund in contributions, interest, liquidated damages and audit fees (*id.* ¶ 127). Pepper received a copy of Havey's report between October 22 and November 5, 1997 (*id.* ¶ 128).

*Sale of the Hills Funeral Home Assets*

Meanwhile, in the summer of 1997 Pepper decided to sell his business, and he retained lawyer Frank Daly ("Daly") to assist him with that process (Hills Stmt. ¶ 129). Sometime during that summer Pepper told Daly that Funds wanted to audit his records (Moriarty Stmt. ¶ 130).[3] Pepper also told Daly, when the audit was completed, that Funds were claiming a "debt" in a dollar amount not yet determined (*id.* ¶ 134).[4]

In September 1997 Pepper began discussing with Jason ("Jason") and Frank ("Frank") Leonard (collectively "Leonards") the possibility of Leonards' buying the assets of Pepper's business (Hills Stmt. ¶ 135). Both Frank and Jason are Union-registered trade embalmers and funeral directors (*id.* ¶¶ 105–06, 109–10). Frank owns the Bukauskas–Leonard Funeral Home, which has been an Association member since 1988 (*id.* ¶¶ 94–95). Bukauskas–Leonard Funeral Home pays contributions to the Health and Welfare Trust and to the Teamsters Local Union No. 727 Legal Assistance Fund on behalf of both Leonards pursuant to remittance forms received by the funeral home (*id.* ¶ 112).

Pepper was represented in the asset sale by Daly (*id.* ¶ 136), while Leonards were represented by James Carroll ("Carroll") (*id.*). During the negotiations Daly told Carroll that a "Union audit" was in progress (*id.* ¶ 137; Moriarty Stmt. Ex. T, Carroll Dep. 10–11, 53–54). Though they did not specifically discuss any potential audit liability, Carroll and Daly agreed that Leonards would not assume any of Pepper's liabilities (Hills Stmt. ¶¶ 144–46). After exchanging a number of drafts, Carroll and Daly completed the Contract for Sale of Real Estate and Asset Purchase Agreement ("Agreement," Hills Stmt. Ex. E), which included this provision (*id.* ¶ 27(A)(c)):

> Seller is not a party to any collective bargaining agreements. Seller represents and warrants that no sums are due any Union as the result of the Seller's business operations.

Pepper and Leonards signed the Agreement on November 5, 1997, with the closing set for January 1998 (Hills Stmt. ¶¶ 164, 166). On December 29, 1997 Carroll called Leonards to discuss the closing

---

3. *Hills purports to deny that, citing to Pepper's deposition testimony. But in the cited testimony Pepper says that he never gave the audit report to Daly, not that he never told Daly about the audit (see Moriarty Stmt. Ex.* O, Pepper Dep. 94–95). Hills' attempted denial thus fails.

4. What was said in the preceding footnote applies here as well.

and told them that the "union wants $100,-000 from Pepper" (Moriarty Stmt. ¶ 169).[5] On January 28, 1998 the sale closed, and Hills Funeral Home became Hills Funeral Home, Ltd. (Hills Stmt. ¶ 171).

### Moriarty–Hills Cross–Motions

 Generally when one corporation purchases the assets of another, the buyer does not assume the liabilities of the seller (*Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac,* 920 F.2d 1323, 1325 (7th Cir.1990)). But the courts have recognized a number of exceptions to that general rule, one being known as the "successorship doctrine." Under that concept courts will impose liability for unpaid contributions to ERISA plans on successor corporations if "there [are] sufficient indicia of continuity between the two companies and ... the successor firm had notice of its predecessor's liability" (*id.* at 1329). Continuity is present if "no major changes are made in [the business] operation" (*EEOC v. G–K–G Inc.,* 39 F.3d 740, 748 (7th Cir.1994); *Artistic Furniture,* 920 F.2d at 1329 (continuity was established by evidence that the successor employed most of the predecessor's personnel, used the predecessor's plant, equipment and machinery, completed the predecessor's work orders and honored warranty claims on the predecessor's products)). As *Artistic Furniture, id.* put it:

> Notice can be proven ... by pointing to facts that conclusively demonstrate actual knowledge, [or] by presenting evidence that allows the fact finder to imply knowledge from the circumstances.

And Moriarty himself has even more recently been successful in reconfirming that the same two-element test remains good law in this Circuit (*Moriarty v. Svec,* 164 F.3d 323, 327–29 (7th Cir.1998)). Both of

those elements are present in this case as well.

Even viewed most favorably to Hills, the undisputed facts establish that there was a continuity of business operations between Pepper's funeral home and Hills. Like its predecessor, Hills provides services typical of the funeral home industry (Hills Stmt. ¶¶ 34, 39). Hills uses the building, telephone number, equipment, furniture and supplies of its predecessor in the operation of its business—indeed, it expressly bought the name "Hills Funeral Home" from Pepper (*id.* ¶¶ 165, 172–75). Two of the four people who worked for Pepper now work for Hills (*id.* ¶¶ 176–77). Finally, Hills now controls the pre-need funeral arrangement trusts that had been held for its predecessor by Association (*id.* ¶ 180). Because the undisputed facts establish that no major change in the business occurred when Hills Funeral Home became Hills Funeral Home Ltd., it cannot be denied that the continuity element is satisfied.

That conclusion is unaltered by the fact that Pepper himself has no involvement in Hills. On that score the question is not, as Hills seems to believe, whether it is the alter ego of Hills Funeral Home, but instead whether there is continuity in the two business operations. And the unqualified affirmative answer to that question is unaffected by Pepper's absence, which was virtually the only difference between the operation of Hills Funeral Home Ltd. and that of Hills Funeral Home.

Even with the required reasonable inferences in Hills' favor, the record also plainly demonstrates that Leonards had notice of Funds' claim. Though the Leonards say that *Pepper* did not tell them money was owed to Funds, they do not assert ignorance of Funds' claim (Hills Stmt. ¶¶ 11, 21; *id.* Ex. J, Frank's Aff. ¶ 4; *id.* Ex.

---

5. Hills attempts to deny this fact by citing to the same deposition testimony that Moriarty claims supports it. Moriarty is right. Leonards received a bill from Carroll that contains this entry for December 29, 1997: "[C]all Jason & Frank re: closing 1/7—union wants

$100,000 from Pepper" (Moriarty Stmt. Ex. T, Carroll Dep. Ex. 9). When Carroll was asked whether that entry indicated he told Leonards that Union wanted $100,000 from Pepper, he replied: "That's what the entry appears to relate, yes" (Carroll Dep. 77–78).

K, Jason's Aff. ¶ 4). Indeed, they cannot legitimately claim ignorance because their attorney Carroll admits that he learned of the audit of Peppers' obligations during the contract negotiations (although he labels that as a Union audit—more on this subject later), and he further acknowledges that he told Leonards the "union wants $100,000 from Pepper" at the end of December 1997 (Hills Stmt. ¶ 137; Moriarty Stmt. Ex. T, Carroll Dep. 10–11, 53–54; Moriarty Stmt. ¶ 169). So Leonards had been told by their lawyer, a full month before the asset sale closed, that "the union" was asserting a claim against Pepper.

To be sure, as Hills points out, Carroll's statement to Reynolds had referred to "the union," rather than more accurately speaking in terms of a claim by "Funds." But it is totally unsurprising to find people engaging in such colloquial usage that makes no distinction between (1) the unions that enter into CBAs that require contributions to employee benefit funds and (2) those funds themselves, even though the law specifically requires the funds' independence from the unions. In this Court's experience, lawyers (who should know better) regularly blur that line by referring to the employer's obligation to "the union" and not to the fund entities.

Here it is unnecessary to rely (inappropriately) on surmise in that respect, for the record expressly reveals that Leonards themselves did not differentiate between Union and Funds in that respect. Both Frank and Jason were Union members who made contributions to the Health and Welfare Fund and the Legal Assistance Fund (Hills Stmt. ¶¶ 107, 110, 112). Frank testified that his contributions to the Health and Welfare Fund were to the "union" for "hospitalization" (id. ¶ 190), and Jason similarly testified that his contributions to the Health and Welfare Fund were "premium[s] for health insurance ... to the union" (id. ¶ 192). Further, shortly before the sale closed Jason told Carroll he was concerned that "the union" would come after Hills because the Bukauskas–Leonard Funeral Home was part of Association (id. ¶ 170). In short, the colloquial usage of owing money "to the union," when what is meant more precisely is owing those monies for employee benefit plan premiums (and hence to Funds), is 100% in sync with Leonards' own usage. And Hills has adduced no facts from which it can even be inferred that Leonards differentiated between Union and Funds in such usage. Hence their admitted knowledge that "the union wants $100,000 from Pepper" plainly satisfies the notice requirement of the successorship doctrine.[6]

To summarize, Hills has not raised a fact issue for trial, either as to the continuity of business operations as between itself and Pepper's sole proprietorship or as to Leonards' being on express notice of Funds' claim prior to the sale. In consequence, Hills is a successor to Pepper's funeral home business as a matter of law and, as such, it is also liable under ERISA for any employer contributions that Pepper owes to Funds.

### Moriarty's Motion Against Pepper

Pepper's membership in Association is not of itself sufficient to bind him to the CBAs (*Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859, 866–67 (7th Cir.1998)). Rather, Pepper is bound to those agreements only if he manifested an

---

**6.** Indeed, the contrary argument advanced by Hills' counsel is really disingenuous, even apart from the evidence of Leonards' own use of language. For over a half century the law has forbidden any payments of "money or other thing of value" by any employer to any labor organization with only limited exceptions (trust fund obligations of the type at issue here and union dues checkoffs being the most noteworthy exceptions), under pain of criminal responsibility for any violation (29 U.S.C. § 186). What then is Hills contending that "the union" wanted the $100,000 from Pepper for—an unpaid union dues checkoff for Pepper's few employees? Like Pepper (as discussed in the next section), Hills cannot play ostrich to escape liability.

"unequivocal intention to be bound by group action in collective bargaining" (*id.* at 865, quoting the approach adopted, and the language quoted in turn, by *Trustees of the UIU Health & Welfare Fund v. New York Flame Proofing Co.,* 828 F.2d 79, 83 (2d Cir.1987)).

Caselaw provides examples of employers who do manifest their intention in such unequivocal terms. Thus in *International Union of Operating Eng'rs, Local 150 v. G. Bliudzius Contractors, Inc.,* 730 F.2d 1093 (7th Cir.1984) the employer signed a membership application stating that "by virtue of membership in good standing in the Builders' Association of Chicago (a not-for-profit corporation) this company/corporation, has with all other members of the Association, delegated and assigned to the Association certain of its rights to bargain collectively with labor organizations," and that it "agrees to be governed by and abides by the provisions of the Constitution and By–Laws of the Builders' Association of Chicago...." In turn those By–Laws deemed each member "to have designated the Association as the exclusive bargaining representative for the purpose of negotiating collective bargaining agreements" (*id.* at 1094–95 & n. 1). Moriarty argues that Pepper, like the employer in *Bliudzius,* expressly indicated his intent to be bound by the CBAs when he applied for membership in Association.

■ Again Moriarty is right. It will be recalled that the Association membership application signed by Pepper expressly said that he "agrees, if elected to membership, to abide by and be bound by the provisions of the Constitution, By-laws, Rules and Regulations of the Association" (Pepper Stmt. ¶ 56).[7] And it will also be recalled that the relevant portion of Asso-

ciation's Constitution in effect at the time expressly provided (*id.* ¶ 59):

> *Labor Negotiations.* The Association, through action by the General Executive Board, shall authorize the President to appoint a committee to represent the members of the Association in labor negotiations or any dispute or grievance which may arise from such labor negotiations and to enter into such agreements as a result of the negotiations, subject to the approval of the membership.

As in *Bliudzius,* that provision was an express delegation of bargaining authority that bound Pepper to the CBAs. And no communication that ensued between Pepper and Association during the nearly two decades of Pepper's Association membership ever changed that original bargain—quite the contrary, the record is rife with repeated communications over the years in which Association regularly reported to its membership (including Pepper) on the collective bargaining process and the resulting CBAs.

That is the critical factor that distinguishes this case from *Glueckert,* where owner Glueckert's Association membership application had read the same way as here, but where Association's Constitution was then totally silent as to the subjects of representing the Association membership in collective bargaining and of binding the members to CBAs subject to membership approval. In 1981, *after* Pepper had joined Association with the quoted Constitution language in effect but *before* Glueckert later joined Association, that quoted language was moved *out* of Association's Constitution and into Association's separate Official Statements of Policy (see *Glueckert,* 155 F.3d at 863 & n. 12).[8] With that being the case, our Court of Appeals found in *Glueckert* that

---

7. That relevant language appears on the second page of the application, which was inadvertently omitted from the materials provided in conjunction with the motions. But the omission is not fatal, because Pepper has admitted that the application language is as stated by Moriarty.

8. Unlike Association's Constitution, such Official Statements of Policy were not listed in the membership application among the documents whose provisions the applicant "agrees ... to abide by and be bound by...."

the required "unequivocal intention to be bound" had not been manifested by the group of inferential factors that this Court (967 F.Supp. 1038 (N.D.Ill.1997)) had considered sufficient in that case. By total contrast, Pepper's *express* contractual undertaking to abide by and be bound by Association's Constitution, coupled with the Constitution's then-existing *express* provisions authorizing CBAs to be negotiated and entered into by Association (subject to approval by the membership generally, which was obtained in every instance), created a contract that satisfied the "unequivocal intention to be bound" test—and Pepper cannot escape that result by his ostrichlike head-in-the-sand arguments discussed hereafter.

Pepper claims that he did not receive from Moriarty either Association's Constitution or copies of the CBAs in effect when he was elected to membership in 1979 (*id.* ¶ 58). Even assuming that to be true, it does not matter. Pepper joined Association and thereafter enjoyed the benefits of its membership—group health insurance, vehicle insurance, the pre-need trust program, the certified copy service and the continuing education seminars—for nearly 20 years (*id.* ¶¶ 57, 63, 65). He cannot escape the consequence of Association membership to which he had expressly agreed—the CBA commitment—just because he never bothered to read the governing documents by which he pledged to abide (see, e.g., *Bliudzius*, 730 F.2d at 1095 n. 3, holding that the employer "had a responsibility to read the By–Laws" that it had agreed to observe, even though the Association there had not provided them to the employer).

Even a criminal defendant cannot escape responsibility by averting his or her eyes to the reality of what has expressly been called to his or her attention (see the so-called "ostrich" instruction as to what constitutes "knowledge," embodied in the even more demanding criminal law context by Instruction 4.06 of the Federal Criminal Jury Instructions of the Seventh Circuit (1998)). Civil litigants such as Pepper can fare no better: He is not absolved of obligations that he freely undertook, simply because he then chose to ignore them.

In sum, Pepper is bound by the CBAs and is liable to Funds for unpaid contributions. And as held earlier, Hills is Pepper's successor as a matter of law and, as such, is also liable.[9] Because the amount for which defendants are jointly and severally liable must still be determined, Moriarty is ordered to submit appropriate proof of each element of his damage claim on or before March 31, 2000. Hills and Pepper are then ordered to respond to Moriarty's submission on or before April 14, 2000.

### Conclusion

There is no genuine issue of material fact as to Moriarty's claims against either Hills or Pepper, and Moriarty is entitled to judgment as to liability as a matter of law against each of them. As indicated in the preceding paragraph, the amount of that joint and several judgment will be determined through further submissions in accordance with this opinion. Hills' cross-motion for summary judgment is denied.

### SUPPLEMENTAL MEMORANDUM OPINION AND ORDER

On March 21, 2000 this Court issued an order granting judgment as to liability to plaintiff Thomas Moriarty as Trustee ("Moriarty") on the claims he asserts against each of the defendants. On March 22, 2000 defendant George Pepper ("Pepper") filed a motion to reconsider that order, asserting that in consequence of our

---

9. Because Agreement ¶ 27(A)(c) contains Pepper's warranty against obligations due to "any Union," and Agreement ¶ 27(B) provides for indemnification by Pepper against any breach of warranty, there is a question as between Pepper and Hills as to whether he must indemnify it against his liability to Funds, for which this opinion has found responsibility on Hills' part as well. That issue was not posed by the current Rule 56 motions.

Court of Appeals' decision in *Moriarty v. Glueckert Funeral Home, Ltd.*, No. 99–1352, 2000 WL 32004, 202 F.3d 274 (7th Cir. Jan. 12)) [1] Moriarty is foreclosed by issue preclusion principles (Pepper's counsel uses the older label of "collateral estoppel" [2]) from arguing that Pepper had agreed to be bound by the relevant collective bargaining agreements ("CBAs") when he joined the Funeral Directors Services Association ("Association").

On March 24, 2000 the parties appeared before this Court for a hearing on Pepper's motion to reconsider. This Court then ruled orally that the motion should be denied for two reasons:

1. Pepper had waived the issue preclusion defense by failing to raise it as soon as it became available.

2. Even if the defense had been raised in a timely fashion, it would have failed on the merits.

What follows is an elaboration of that oral ruling, which this Court had then indicated would be forthcoming.

Motions to reconsider interlocutory orders are not literally provided for in any of the Federal Rules of Civil Procedure ("Rules"). Instead they are common law motions addressed to a court's inherent power to modify orders in a pending case before final judgment (*Peterson v. Lindner*, 765 F.2d 698, 704 (7th Cir.1985)). In the context of motions to reconsider final judgments (which are also not literally provided for in any Rule), courts have frequently spoken in terms such as those voiced in *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir.1990), quoting *Above the Belt, Inc.*

*v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D.Va.1983):

> A motion for reconsideration performs a valuable function where the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. A further basis for a motion to reconsider would be a controlling or significant change in the law or facts since the submission of the issue to the Court. Such problems rarely arise and the motion to reconsider should be equally rare.

That level of inhospitability to motions for reconsideration does not apply with equal force where, as here, the earlier opinion was interlocutory—in this instance, a determination as to liability only. But where the purported ground for reconsideration was a matter that was already available as an affirmative defense to liability (as it was here) but that was not advanced by Pepper when liability was under consideration (and it was not), considerations of waiver come into play. More on this subject a bit later.

■ Pepper argues that the Court of Appeals' decision in *Hitzeman II* is a controlling change in the law that would have constituted a ground for reconsideration even of a final order. Not so. As *Bank of Waunakee*, 906 F.2d at 1191 makes clear, a controlling change in the law is a viable ground for such reconsideration only if it occurs *after* the issue is submitted to the court for decision. In this instance the issue preclusion argument that Pepper now raises became available to him almost

---

1. Because that unpublished opinion dealt with appeals in three different cases and because the one on which Pepper seeks to rely addressed Moriarty's action against Hitzeman Funeral Home, Limited ("Hitzeman"), it will be referred to here as *"Hitzeman II."* Citations to that opinion will take the form *"Hitzeman II* at *\*___,"* referring to the Westlaw \* pagination but omitting the case's docket number and the lengthy WL citation.

2. In accordance with this Court's regular practice, this opinion follows the teaching exemplified by *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984) by employing the term "issue preclusion"—except, of course, when quoting from authorities that use "collateral estoppel."

a full year ago—on April 29, 1999, when Judge Kocoras rendered his opinion (No. 98 C 3563, 1999 WL 286077 (N.D.Ill. Apr. 29)[3]) in Hitzeman's favor (see, e.g., *Prymer v. Ogden*, 29 F.3d 1208, 1213 n. 2 (7th Cir.1994) and cases cited there).

As if that were not enough (and it is, as the ensuing discussion shows), it will be recalled that our Court of Appeals affirmed Judge Kocoras' decision on January 12 of this year, giving Pepper ample opportunity to have raised the issue during the two-month-plus period that elapsed before this Court rendered its opinion resolving the summary judgment motions in Moriarty's favor. Inexplicably, even though Pepper's counsel admits he was aware of Judge Kocoras' *Hitzeman I* decision and even cited it in another respect in his memorandum opposing summary judgment, he did not raise the issue preclusion contention until after summary judgment had been ordered against Pepper.

■ Most importantly for present purposes, even in the interlocutory order situation that sequence of events constitutes a waiver of the defense, just as it would have barred a comparably late assertion (say) of a statute of limitations defense. Such affirmative defenses (see Rule 8(c), listing "estoppel" as well as "statute of limitations") must ordinarily be pleaded in the answer, or they will be found to have been waived (see 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction* § 4405, at 34 (1981), stating "The reference to estoppel [in Rule 8(c) ] has been treated as including collateral estoppel"). By the same token, when as in this instance such a preclusion defense does not become available until later in the litigation, it must be raised "at the first reasonable opportunity after the rendering of the decision having the preclusive effect" (*Aetna Cas. & Sur. Co. v. General*

*Dynamics Corp.*, 968 F.2d 707, 711 (8th Cir.1992)).

■ It is really an understatement to say that Pepper had plenty of time between April 29, 1999 (when Judge Kocoras rendered his *Hitzeman I* decision) and March 21, 2000 (when this Court rendered its decision here) to raise the issue preclusion defense, either by seeking leave to amend Pepper's answer or simply by arguing the point in his summary judgment motion. By holding that argument in abeyance until judgment as to liability had been rendered against him, Pepper has waived the issue preclusion defense.

This conclusion finds solid support in the caselaw. For example, in *American Nat'l Bank & Trust Co. v. RTA*, 125 F.3d 420 (7th Cir.1997) defendant sought leave, after the trial was completed, to amend its answer to assert an issue preclusion defense. Although the state court decision on which that defense relied had not been issued at the time of trial, the district court denied the motion to amend because defendant's counsel had been aware of the possible issue preclusion defense and "there [had been] ample basis and opportunity to raise collateral estoppel as an affirmative defense earlier" (*id.* at 429 (internal quotation marks and citation omitted)). Because defendant "was aware of the state court litigation and the theories it was pressing there, but did not list collateral estoppel as an issue in the pretrial order" (*id.* at 429), our Court of Appeals affirmed the district court's decision (*id.* at 430).

In an important sense, the argument for waiver here is even stronger than in *American Nat'l Bank.* If failing to raise an *inchoate* affirmative defense of which a defendant is aware can constitute a waiver, certainly Pepper's failure to assert issue preclusion based on a decision issued nearly a year *before* he had to face the imminent possibility of an adverse summary

---

**3.** Citations to that decision at the District Court level will take the form *"Hitzeman I* at *___,"* again referring to the Westlaw * pag-

ination but omitting the docket number and lengthy WL citation.

judgment in this action constitutes such a waiver. There is a sharp contrast between a case such as *Kern Oil & Refining Co. v. Tenneco Oil Co.*, 840 F.2d 730, 735 (9th Cir.1988), which held that a defendant who did not raise issue preclusion until after trial had waived that defense, and *Cotton States Mut. Ins. Co. v. Anderson*, 749 F.2d 663, 665–66 (11th Cir.1984), which permitted an appellee to raise issue preclusion for the first time at oral argument on appeal because the decision with the preclusive effect had not been rendered until after judgment was entered and after the parties had filed their appellate briefs.

■ But suppose that no such waiver were operative, or that Pepper had timely asserted his issue preclusion argument. Even then he would not have prevailed. It must be remembered that issue preclusion will bar relitigation of an issue only if the four elements reiterated in *La Preferida, Inc. v. Cerveceria Modelo S.A. de C.V.*, 914 F.2d 900, 906 (7th Cir.1990) have been met:

> 1) the issue sought to be precluded must be the same as that involved in the prior action, 2) the issue must have been actually litigated, 3) the determination of the issue must have been essential to the final judgment, and 4) the party against whom estoppel is invoked must be fully represented in the prior action.

Pepper cannot satisfy the first element, because the issue decided in *Hitzeman I* and *Hitzeman II* is materially different from the one presented by Pepper's case.

*Hitzeman II* did not, as Pepper seems to believe, hold that a funeral home owner's express agreement to abide by the Association's Constitution can never evidence an intent to be bound. It rather held that owner Hitzeman's agreement to do so could not support an inference of such an intent in light of the circumstances presented in that case. As is typical of issues involving intent, the intent-to-be-bound inquiry is wholly dependent on the facts of an individual case (see *Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859, 866–67 (7th Cir.1998), listing the factors to be evaluated in determining whether an employer had an unequivocal intent to be bound). Thus *Hitzeman II* would have preclusive effect only if the facts of Pepper's case were identical (in the legal sense) to those in *Hitzeman II*. As a brief description of that case illustrates, they are not.

Hitzeman is a family-run funeral home started by Norbert Hitzeman ("Norbert") and now owned by Norbert's son Todd ("Todd"), Todd's wife Susan ("Susan") and Todd's sister Jan ("Jan"). Hitzeman joined the Association in 1962, and in 1979 Norbert signed a membership record that said Hitzeman agreed to be bound by the Association's Constitution, By-laws, Rules and Regulations. At that time the Constitution, the same one that was in effect when Pepper joined the Association, stated:

> Association ... shall authorize the President to appoint a committee to represent the members of the Association in labor negotiations ... and to enter into such agreements as a result of the negotiations, subject to the approval of the membership.

Like Pepper, Hitzeman did not make any contributions to the Funds. And like Pepper, the Hitzemans chose not to attend Association's meetings at which the CBAs were discussed.

But there the factual matrices diverge sharply, and in critical fashion. Unlike Pepper, Hitzeman had its own pension plan, and an insurance plan that covered Todd and Susan (*Hitzeman I* at *2, *Hitzeman II* at *4). Moreover, on several occasions between 1979 and 1990 Moriarty assured Norbert and Todd that the funeral home was not required to contribute to the Funds on behalf of Todd, Jan or any other shareholder (*Hitzeman I* at *2–3, *Hitzeman II* at *4). And importantly, the contributions sought from Hitzeman were for the very owner-shareholders that were the subject of Moriarty's assurances (*Hitze-*

*man I* at \*3, *Hitzeman II* at \*4)—a situation vitally different from that in Pepper's case. Given those assurances by Moriarty that no contributions were due on account of the owner-shareholders and given Hitzeman's conduct in establishing its own employee benefit plans, our Court of Appeals affirmed Judge Kocoras' holding that Hitzeman had not manifested an unequivocal intent to be bound by the CBAs despite its agreement to abide by the Association's Constitution (see *Hitzeman II* at \*4).

By sharp contrast, Pepper did not have separate insurance or pension plans for his employees. Nor was he ever told by Moriarty or anyone else from the Funds that he was not required to make contributions. And the persons with respect to whom contributions are sought from Pepper, unlike the Hitzeman principals, were not owners of the funeral home (a category of persons whom the Funds generally excuse from contributing, *Hitzeman I* at \*3 n. 2). Thus the best evidence of Pepper's intent remains his express contractual agreement to abide by Association's Constitution. Because the issue that this Court has decided in this case is different from the one that our Court of Appeals decided in *Hitzeman II*, Pepper's issue preclusion argument would have failed even if he had raised it in a timely fashion.

### Conclusion

What has been said here gives full and definitive amplification to this Court's views expressed orally on March 24, 2000. Pepper's motion to reconsider this Court's March 21, 2000 memorandum opinion and order is denied.