**BML STAGE LIGHTING, INC. and Carbine Management, Inc., Appellant,**

v.

**MAYFLOWER TRANSIT, INC., Appellee.**

No. 14–98–00887–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 24, 2000.

Barbara Emerson, Dallas, for appellants.

Steven C. Malin, McKinney, for appellees.

Panel consists of Justices SEARS, DRAUGHN, and HUTSON–DUNN.*

## O P I N I O N

JOE L. DRAUGHN, Justice (Assigned).

We are asked in this appeal to determine whether a carrier may assert a lien on property in its possession where the property's owner was a stranger to the shipping contract and was not the shipper, consignor, or consignee. Because we find as a matter of law that a carrier may not assert a lien in such a situation, we reverse, render judgment that a lien did not exist, and remand for a new trial on the property owner's conversion claims.

**BACKGROUND**

This is an appeal from a jury trial in which Mayflower Transit, Inc. claimed a lien and right to foreclose on lighting equipment owned by BML Stage Lighting, Inc. and Carbine Management, Inc. (collectively "BML"). BML leased the lighting equipment to SportsLab, Inc., who in turn hired Mayflower to transport this equipment and 101 other truckloads of goods around the country for a touring sports exhibition. The SportsLab tour folded after its second show, and SportsLab soon declared bankruptcy. Because SportsLab had failed to pay its transport and storage bill, Mayflower retained the goods and equipment from the exhibition and claimed a lien on them. Learning that SportsLab had folded, BML asked for return of its lighting equipment. SportsLab informed BML that Mayflower was "holding the equipment hostage." Even when BML directly requested its three truckloads of lighting from Mayflower, the carrier refused to release them unless SportsLab's total bill for 104 truckloads was paid. When BML became more persistent in seeking return of its lighting, Mayflower sued BML, arguing it had a lien and right to sell the lighting. At trial, the jury found that Mayflower had a valid lien on the lighting, and the trial court entered a judgment for Mayflower that permitted it sell BML's lighting to help cover the SportsLab bill.

BML appeals in three points of error,[1] but we need only address its second point: that there was no evidence of a lien against BML's lighting to warrant a jury question about the lien's existence. Mayflower first responds that this appeal should be dismissed as moot, but we disagree. Mayflower next responds that it presented legally sufficient evidence of a contractual and a common law lien on BML's lighting. After consulting some 100–year–old law books and giving considerable study to the law on carriers, we reverse and render in part and reverse and remand in part. We hold as a matter of law that Mayflower had no contractual or common law lien on BML's lighting.

## MOOTNESS AND PRESERVATION OF ERROR

Initially, we address Mayflower's argument that we should dismiss this appeal for two reasons: 1) mootness, because it has already sold BML's lighting equipment; and 2) BML failed to preserve error. We disagree with each argument in turn.

---

* Senior Justices Ross A. Sears, Joe L. Draughn, and D. Camille Hutson–Dunn sitting by assignment.

1. BML also appealed that 1) the judgment is void because it fails to identify the property to be sold and the amount of the lien; and 2) the trial court erred in submitting a jury question that misstated the law.

## A. Mootness

■ Mayflower argues that this appeal is moot because it sold BML's lighting equipment after trial on December 17, 1998. According to Mayflower, an attack upon a foreclosure is moot when the foreclosure sale is held before an appellate decision is released. *See, e.g., Brown v. Fleming*, 212 S.W. 483, 484 (Tex. Comm'n App.1919, judgm't adopted); *Valley v. Patterson*, 614 S.W.2d 867, 869–70 (Tex.Civ. App.-Corpus Christi 1981, no writ). However, BML is not seeking an injunction against a foreclosure sale. Rather, BML is seeking, through a claim of conversion, the value in damages of the lighting equipment, not the lighting equipment itself. *See generally Commercial Credit Corp. v. Flores*, 345 S.W.2d 432, 433 (Tex.Civ. App.—Eastland 1961, writ ref'd n.r.e.) (holding that the proper measure of damages for conversion is the fair market value of the items converted at the time of the conversion). The injunction cases cited by Mayflower are thus inapplicable. This appeal is not moot and we have jurisdiction to address it.

## B. Preservation of Error

■ Mayflower also argues that BML failed to preserve its no evidence point of error. Mayflower insists that to bring its appeal, BML must assign error to three portions of the trial court's judgment. Specifically, Mayflower argues that BML must assign error to portions of the judgment that state: 1) Mayflower was entitled to possession of the lighting equipment; 2) Mayflower's actions "did not constitute conversion, tortious interference, or any other legal wrong"; and 3) BML should take nothing on its counterclaims for conversion and tortious interference.

■ There are five ways, however, to preserve error for no evidence challenges: 1) a motion for instructed verdict; 2) an objection to the submission of a jury question; 3) a motion for judgment notwithstanding the verdict; 4) a motion to disregard the jury's answer to a vital fact question; or 5) a motion for new trial. *See Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex.1991); *Neller v. Kirschke*, 922 S.W.2d 182, 187 (Tex.App.-Houston [1st Dist.] 1995, writ denied). In this case, BML requested an instructed verdict at the close of Mayflower's case-in-chief, arguing Mayflower failed to prove the existence of a lien on BML's equipment. Over BML's objection, the trial court submitted the lien question to the jury. Further, questions in the jury charge about BML's conversion counterclaim were predicated on a negative answer to the lien question. And because of its answer about a lien's existence, the jury never reached the conversion questions. After the jury found that Mayflower possessed a lien on BML's lighting, BML reurged its no evidence point in a motion for new trial. Accordingly, we find that it has preserved error.

## STANDARD OF REVIEW

■ In determining a no evidence point, we are to consider all of the evidence in the light most favorable to the verdict. *See Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex.1998); *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997), *cert. denied*, 523 U.S. 1119, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998). A no evidence point of error may be sustained when the record discloses one of the following: 1) a complete absence of evidence of a vital fact; 2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; 3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or 4) the evidences establishes conclusively the opposite of a vital fact. *See Merrell Dow Pharm.*, 953 S.W.2d at 711 (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L.Rev. 361, 362–63 (1960)).

## NO EVIDENCE OF LIEN AGAINST BML

BML appeals that Mayflower offered no evidence of a lien against BML's lighting equipment and that the trial court should not have submitted a jury question about the lien's existence. Mayflower responds that it produced legally sufficient evidence of a lien on BML's lighting equipment on two independent bases: (1) its contract with SportsLab and (2) federal common law.

### A. The Contract with SportsLab

Mayflower and SportsLab signed a contract that obligated Mayflower to provide transportation for a series of shipments of exhibits and trade show goods. SportsLab was the exclusive shipper of the goods. It was also the consignor and consignee. Additionally, this contract incorporated the terms of Mayflower's ninety-four page tariff, AERM 401–B, which includes the following language: "if shipper fails or refuses to pay lawfully applicable charges ... carrier may sell the property at its option." Mayflower argues that this clause establishes a lien on BML's lighting equipment.

### 1. Bound by Contract's Terms?

■ Based on this clause, Mayflower contends it can assert a contractual lien on goods owned by a third party, such as BML. A contract, however, generally binds no one except the parties to it. *See In re Exec Tech Partners*, 107 F.3d 677, 681 (8th Cir.1997). And courts generally cannot bind a nonparty to a contract because the nonparty never agreed to the contract's terms. *See E.E.O.C. v. Frank's Nursery & Crafts, Inc.*, 177 F.3d 448, 460 (6th Cir.1999). These simple contract principles apply to liability for freight charges:

> Liability for the payment of freight charges, in the absence of any statutory provision or binding rule or regulation to

the contrary, is based upon the agreement of the parties to the contract of carriage.... The mere fact of the ownership of the goods does not of itself impose liability upon the owner for the payment of freight charges thereon....

13 Am.Jur.2d *Carriers* § 471 (1964). Thus, where an owner of goods is not a party to the contract for carriage, nor even the shipper, consignor, or consignee, a carrier cannot enforce a contractual lien against the owner's goods. *See Goodpasture v. M/V Pollux*, 602 F.2d 84, 86 (5th Cir.1979) (when shipper failed to pay for freight, ship owner had no contractual lien against the cargo because the cargo's owner was not a party to the shipping contract); *see also T.J. Stevenson & Co. v. 81,193 Bags of Flour*, 629 F.2d 338, 375 (5th Cir.1980); *Prozina Shipping Co. v. Thirty–Four Automobiles*, 179 F.R.D. 41, 44–45 (D.Mass. 1998) (holding that no lien exists on cargo owned by third parties).[2]

### 2. Bound by Filed Tariff?

■ Although BML is not a party to the contract, Mayflower contends that the tariff alone obligates BML to submit to a lien. Mayflower argues that because its tariff is publicly filed, the public as a whole is bound with notice of the tariff's terms. Citing *Boston & Me. R.R. v. Hooker*, 233 U.S. 97, 34 S.Ct. 526, 58 L.Ed. 868 (1914) and *Harrah v. Minnesota Mining & Mfg.*, 809 F.Supp. 313, 318 (D.N.J.1992), Mayflower argues that because its contract with SportsLab incorporates the publicly-filed tariff, BML is bound by the contract. We disagree.

Mayflower's references to *Hooker* and *Harrah* are taken out of context. First, *Hooker* held that the shipper of goods, not the public as a whole, was bound with notice of the tariff rates. *See* 233 U.S. at 112, 34 S.Ct. 526. Second, in *Harrah*, the plaintiff was the consignee of a package and as such was "presumed to know the

---

**2.** Mayflower attempts to distinguish *Goodpasture* because it is a maritime case. We find this unpersuasive. Much of carrier law de-

rives from *in rem* actions against ships and steamboats. *See, e.g., Bird of Paradise*, 72 U.S. (5 Wall.) 545, 18 L.Ed. 662 (1866).

existence, effect, and applicability of tariff provisions." 809 F.Supp. at 318. Thus, it was the plaintiff's status as consignee that charged him with notice of the tariff, not his status as a member of the public. Here, however, BML was not the consignee, consignor, or shipper. Mayflower fails to cite a single case where a carrier enforced a contractual lien via its published tariff against a third party who was not a consignee, consignor, or shipper. Therefore, we reject Mayflower's reasoning.

### 3. Bound by Apparent Authority?

▆▆▆▆ Lastly, Mayflower contends that BML should be bound by the contract because it clothed SportsLab with apparent authority to ship the lighting. Apparent authority, a precept of agency law, exists when a principal clothes its agent with the semblance of authority such that a reasonably prudent person would be justified in believing that the agent has the power the person assumes that he has. *See Kral, Inc. v. Southwestern Life Ins. Co.,* 999 F.2d 101, 104 (5th Cir.1993). In the context of carriage of goods, if an owner (as principal) clothes a shipper with apparent authority to ship goods, a carrier is entitled to a lien for unpaid freight charges even though the owner did not actually consent to the terms of carriage. *See* 13 AM.JUR.2D *Carriers* § 499 (1964); *see, e.g., Great N. Ry. Co. v. O'Connor,* 232 U.S. 508, 514, 34 S.Ct. 380, 58 L.Ed.2d 703 (1914); *Burnell v. Butler Moving & Storage,* 826 F.Supp. 65, 68 (N.D.N.Y.1993).

▆▆▆ Mayflower argues apparent authority exists because BML allowed SportsLab to clothe itself with indicia of ownership, permitted SportsLab to arrange transportation for the lighting, and knew that Mayflower was SportsLab's carrier. There are four problems with Mayflower's argument. First, SportsLab was a lessee of BML's lighting, and a lessee's status does not automatically make it an agent authorized to enter contracts on behalf of a lessor. *See, e.g., Frank v. United States,* 797 F.2d 724, 726 (9th Cir.1986). In examining the evidence, we see no proof that an agency existed between BML and SportsLab. Even Mayflower's representative at trial called SportsLab a "mutual client" of Mayflower and BML.

Second, for apparent authority to exist, Mayflower must have believed that BML consented to have SportsLab transport the lighting *on BML's behalf. See Moriarty v. Glueckert Funeral Home,* 155 F.3d 859, 866 (7th Cir.1998). Were we to assume that an agency existed, Mayflower fails to direct us to any evidence that it believed shipment was on BML's behalf.

▆▆▆ Third, Mayflower must prove that it knew about the facts giving color to the alleged agency at the time it dealt with SportsLab. *See Moriarty,* 155 F.3d at 866; 3 AM.JUR.2D *Agency* § 80 (1986). There is no evidence that Mayflower, at the time it dealt with SportsLab, knew that BML was "authorizing" the shipment of its lights. To the contrary, the evidence shows that Mayflower did not learn about BML's existence until after the SportsLab tour folded in Houston.

▆▆▆ Fourth, only an alleged principal's words or conduct that are represented to the third party can clothe an alleged agent with apparent authority. *See Moriarty,* 155 F.3d at 866; *see also* 3 AM.JUR.2D *Agency* § 80 (1986); *cf. NationsBank, N.A. v. Dilling,* 922 S.W.2d 950, 952–53 (Tex.1996). The representations must be those of the principal, not those of the agent. *See Kral,* 999 F.2d at 104. Although Mayflower claims that BML authorized SportsLab to ship the lighting as a part of the tour's goods, there is no evidence that BML manifested such an authorization. At most, the evidence shows that SportsLab informed Mayflower that others' trailers and equipment would be part of the transport and that BML knew Mayflower was SportsLab's carrier. Mayflower testified, however, that it did not care where a shipper got its goods so long as the shipper, as the customer, had the responsibility for making payment.

Furthermore, contrary to manifesting authority in SportsLab, the evidence showed that BML acted according to industry custom in leasing its lights. It required SportsLab to pay for the lease and obtain a certificate of insurance. Its lighting agreement with SportsLab forbade SportsLab to place liens or encumbrances on the lighting.[3] Therefore, no evidence supports Mayflower's apparent authority argument.

In conclusion, in accordance with contract principles and *Goodpasture*, we hold that a carrier has no contractual lien against an owner's goods when the owner is a stranger to the contract and is not the shipper, consignor, or consignee. Thus, as a matter of law, Mayflower has no contractual lien on BML's lighting. Further, we reject Mayflower's argument that BML is bound to the contract because of Mayflower's publicly-filed tariff. Finally, we also reject Mayflower's argument about apparent authority because there is no evidence of an agency relationship between SportsLab and BML and there is no evidence to support the prerequisites of apparent authority, if an agency existed.

### B. Common Law Lien

Mayflower claims that the second basis for its lien on BML's lighting is federal common law. BML counters that because Mayflower acted as a contract carrier, not a common carrier, it is not entitled to claim a common law lien on the goods from the SportsLab tour. We agree with BML and hold that a contract carrier is not entitled to assert a common law lien. Further, we hold that no evidence shows that Mayflower acted as a common carrier in the SportsLab tour so as to permit exercise of a common law lien.

 A common carrier has been defined as "one who holds himself out to the public as engaged in the business of transporting persons or property from place to place, for compensation, offering his services to the public generally." 13 Am.Jur.2d *Carriers* § 2; *see Propeller Niagara v. Cordes*, 62 U.S. (21 How.) 7, 22, 16 L.Ed. 41 (1858). The distinctive characteristic of a common carrier is that it undertakes to carry goods for all persons indifferently. 13 Am.Jur.2d *Carriers* § 2. In recognition of the common carrier's obligation to accept property for transport, the common law permits the carrier to retain possession of goods until its charges are paid. *See In re 4,885 Bags of Linseed*, 66 U.S. (1 Black) 108, 113, 17 L.Ed. 35 (1861); *Wabash R.R. Co. v. Pearce*, 192 U.S. 179, 187, 24 S.Ct. 231, 233, 48 L.Ed. 397 (1904) *Central Ry. Co. v. Schick*, 38 F.2d 968, 970 (3d Cir.1930).

 Conversely, a contract, or private, carrier undertakes by special agreement to transport property or persons. *See Koppers Conn. Coke Co. v. James McWilliams Blue Line, Inc.*, 18 F.Supp. 992, 994 (E.D.N.Y.1936). Contract carriers do not undertake carriage for all persons indiscriminately. 13 Am.Jur.2d *Carriers* §§ 8–9. Further, unlike a common carrier, a contract carrier assumes no duty to the public. *Koppers Conn. Coke Co.*, 18 F.Supp. at 994. By virtue of these differences, at common law, a contract carrier has no common law lien on the goods in its possession. *Fuller v. Bradley*, 25 Pa. 120 (1855); *Picquet v. M'Kay*, 2 Blackf. 465, 1831 WL 1974 at *1 (1831); *Tucker v. Capital City Riggers*, 437 N.E.2d 1048, 1051 (Ind.Ct.App.1982); *Campbell v. A.B.C. Storage & Van Co.*, 187 Mo.App. 565, 174 S.W. 140, 140 (1915); *Thompson v. New York Storage Co.*, 97 Mo.App. 135, 136, 70 S.W. 938, 939 (1902); 13 Am.Jur.2d *Carriers* § 498 ("Under the common law, one who is not a public or common carrier, but specially undertakes to carry a particular load for hire, has no lien for the freight charges thereon"); 13 C.J.S. *Carriers* § 484 (1990) ("At common law, a com-

---

**3.** After the tour folded, SportsLab sent a letter to Mayflower that acknowledged it had leased the lighting from BML per an attached written, but unsigned, lighting agreement. The portion of the contract SportsLab sent to Mayflower includes the "no liens" provision.

mon carrier has a lien upon goods delivered to it for carriage, but a contract carrier does not.").

### 1. Can a Contract Carrier Assert a Common Law Lien?

Mayflower nonetheless claims there is no requirement that a carrier be a common carrier to benefit from a common law lien. Instead, it argues that federal law provides a different standard. For instance, Mayflower points to federal requirements that both contract carriers and common carriers must file tariffs. 49 U.S.C.A. § 10702 (West 1995) (amended Dec. 29, 1995). Mayflower also points to case law about an amendment to the Interstate Commerce Act that preempted state law negligence claims by a shipper against both common carriers and contract carriers. *See Hughes Aircraft Co. v. North Am. Van Lines, Inc.,* 970 F.2d 609 (9th Cir.1992) (discussing preemption by the Carmack Amendment). With these examples, Mayflower says the federal law has specifically rejected any notion that contract carriers have none of the legal benefits that inure to common carriers.

■■■ Despite Mayflower's examples, no federal law erased the distinctions between the two types of carriers so that all benefits of a common carrier flow to a contract carrier as well. Indeed, the version of the Interstate Commerce Act in effect when Mayflower and SportsLab contracted defined "motor contract carrier" and "motor common carrier" in accordance with the common-law definitions. Under the Act, a motor common carrier "hold[s] itself out to the general public to provide motor vehicle transportation for compensation over regular or irregular routes, or both." 49 U.S.C.A. § 10102(15) (West 1995) (amended Dec. 29, 1995). A motor contract carrier provides transportation of "property for compensation under continuing agreements with one of more persons (i) by

assigning motor vehicles for a continuing period of time for the exclusive use of each such person; or (ii) designed to meet the distinct needs of each such person." 49 U.S.C.A. § 10102(16)(B) (amended Dec. 29, 1995). Mayflower fails to cite, and we cannot find, any federal law that permits a contract carrier to retain a common law lien. As such, we decline to depart from long-established common law that denies a common law lien to a contract carrier. We hold that a contract carrier has no common law lien on goods in its possession.[4]

### 2. Was Mayflower a Common Carrier?

■■■ Next, we address Mayflower's argument that it did not act as a contract carrier in its dealings with SportLab, but as a common carrier acting under a specific contract. Implicit in Mayflower's argument is recognition that a single carrier can act as a common carrier or a contract carrier, varying from job to job. *See Thrasher Trucking Co. v. Empire Tubulars, Inc.,* 983 F.2d 46, 48 (5th Cir.1993); *see also Hargrave v. Freight Distrib. Serv.,* 53 F.3d 1019, 1022 (9th Cir.1995); *Chenery v. Employers' Liab. Assur. Corp.,* 4 F.2d 826, 827 (9th Cir.1925). Naturally, disputes can arise about which status applies to a carrier in specific jobs. *See, e.g, Transrisk Corp. v. Matsushita Electric Corp. of Am.,* 15 F.3d 313 (4th Cir.1994) (determining whether carrier was a motor contract carrier or a motor common carrier entitled to payment of higher rate). Thus, the federal courts developed tests to determine under which status a carrier was acting in a particular job.

■■■ A common carrier's status is determined "by reference to what the [the trucker] holds itself out to be," *Hughes Aircraft,* 970 F.2d at 613 (alteration in the original); *see also Ensco, Inc. v. Weicker Transfer & Storage Co.,* 689 F.2d 921, 925 (10th Cir.1982). As Mayflower correctly

---

4. Like the court in *Thompson v. New York Storage Co.,* "we have searched the books, and found no case allowing a lien to a private carrier, while those cited deny it." 70 S.W. at 939.

notes, the existence of a signed contract with a shipper is not the sole determining factor of whether a carrier acted as a contract carrier. *Hughes Aircraft*, 970 F.2d at 613–14. Instead, to achieve contract carrier status, the carriage must satisfy either the "distinct needs" or the "continuing agreements" provisions in the Interstate Commerce Act's definition of motor contract carrier. *See Transrisk Corp.*, 15 F.3d at 315–16. Federal courts have interpreted the "distinct needs provision" as a need "for a different or a more select or a more specialized service than common carriage provides." *Id.* at 316. "The important element in distinguishing contract carriers from common carriers is the factor that the contract carriers render specialized service." *Ensco*, 689 F.2d at 927. These two tests also appear compatible with the common law definitions of contract and common carrier.

Thus, keeping these two tests in mind, we examine the record to determine whether any evidence shows that Mayflower held itself out as a common carrier or whether the evidence shows that Mayflower met SportsLab's distinct needs. Mayflower argues that the evidence shows it acted as a common carrier because: (1) it held itself out to be an interstate common carrier of goods; (2) it routinely hauls household goods from state to state; and (3) it and SportsLab agreed to be bound by the publicly filed tariff. However, the evidence it cites for this proposition is taken out of context. While the evidence does show that Mayflower is a seventy-year-old company, the first · sophisticated carrier in the United States, and historically involved in moving household goods from residence to residence, no evidence showed that Mayflower acted as a common carrier in the specific job for SportsLab.

Instead, Mayflower held itself out to SportsLab that it was a specialized carrier for tours. Additionally, it had formed a special non-household goods division, called the Special Transportation Systems division, to carry unusually large items, specialized medical equipment, and industry trade show goods. This special division of Mayflower bid on the SportsLab contract in a competitive process; SportsLab did not first approach Mayflower.

Further, the evidence reveals that Mayflower had never undertaken a project of SportsLab's size. SportsLab's tour was three times larger than Mayflower's previously largest traveling show. It involved diverse requirements, including thirty to forty flatbed haulers, which Mayflower did not own in its fleet and had to specially arrange. Besides specially arranging flatbed hauler service, Mayflower agreed to provide ten 53–foot–long trailers to SportsLab at no additional charge. It also agreed to provide drivers for certain trailers that SportsLab owned, which a common carrier is under no obligation to do. *See Sasinowski v. Boston & M.R.R.*, 74 F.2d 628, 631 (1st Cir.1935). Mayflower's resources and workers dedicated to the project were great, and it considered the project difficult, challenging, and exciting. In short, to Mayflower, the project was "massive" and "unusual."

Besides the competitive bidding process and resources tailored for SportsLab's distinct needs, Mayflower's nomenclature acknowledged that it was acting as a contract carrier. At trial, Mayflower's representative admitted that it considered the shipment to be "contract carrier." Additionally, Mayflower offered in evidence its permit from the Interstate Commerce Commission, which authorized Mayflower to act as a "contract carrier by motor vehicle." Lastly, the contract between SportsLab and Mayflower identifies Mayflower's role as providing "contract carrier transportation services," which were "specialized services" on a series of shipments. Mayflower also calls itself "an interstate contract carrier" in an addendum to the contract. The contract sets forth a rate of fifteen percent less than Mayflower's tariff rate, a discount which a common carrier would not be permitted to negotiate. *See Hargrave*, 53 F.3d at 1021 & 1022 (noting

that motor common carrier must adhere to tariff rate, while motor contract carrier is exempt from adhering to rate). The contract also permits SportsLab to pay its bills after thirty days, which is apparently not a provision afforded to customers of common carriers. *See Transrisk,* 15 F.3d at 316. All the evidence shows that in the SportsLab project, Mayflower held itself out as a contract carrier. The services it provided were designed to meet SportsLab's exclusive and specialized needs, not like those services provided to the general public indiscriminately. There is no evidence that Mayflower merely acted as a common carrier under a signed contract in the SportsLab project.

Because all the evidence shows Mayflower was unequivocally acting as a contract carrier for SportsLab, it cannot assert a common law lien on the goods in its possession. Mayflower has provided no federal authority to the contrary. Accordingly, we cannot deviate from the common law that denies Mayflower a common law lien.

## CONCLUSION

Having held that Mayflower held no contractual or common law lien against BML's lighting, we find that the trial court erroneously submitted an issue about the lien's existence to the jury. Accordingly, we reverse and render judgment that Mayflower Transit, Inc. held no lien on BML Stage Lighting, Inc. and Carbine Management, Inc.'s stage lighting equipment. Further, because jury questions about conversion were predicated upon the jury's first finding no lien, the jury did not address whether Mayflower Transit, Inc. had converted BML Stage Lighting, Inc. and Carbine Management, Inc.'s stage lighting equipment. Accordingly, we reverse and remand for a new trial on the conversion claims.