COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-07-014-CV

 

 

MISSION LINEN SUPPLY, INC.                                               APPELLANT

 

                                                   V.

 

SANDY=S SIGNALS, INC.                                                      APPELLEES

D/B/A KWIK KAR & LUBE OF 

GRANBURY AND SAUNDRA 

SCHAAD, INDIVIDUALLY                                                                      

 

                                              ------------

 

                FROM
COUNTY COURT AT LAW OF HOOD COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

I. Introduction 








In three issues, Appellant
Mission Linen Supply, Inc. (AMission@) appeals
the trial court=s finding
that Phillip Elliott did not possess apparent authority and its finding that
the liquidated damages provision of the rental service contract was
unenforceable as a penalty.  We affirm.    

II.  Factual and Procedural Background

This is the case of the
liquidated linens.

Mission operates two uniform
and textile rental services plants in Texas, as well as a depot.  Appellees Sandy=s Signals, Inc. d/b/a Kwik Kar & Lube of Granbury (AKwik Kar@) and
Saundra (ASandy@) Schaad are in the business of changing oil and providing maintenance
for automobiles.  Sandy serves as the
president and owner of the business and her husband William (ABill@) Schaad
serves as the vice president and treasurer.

Kwik Kar=s assumed name certificate states that Sandy is the sole owner of Kwik
Kar.  Moreover, the plaques and business
cards displayed inside Kwik Kar indicate that Sandy and Bill are the sole
proprietors of the business.  There was
also a corporate resolution executed at the time of incorporation that states
that Sandy and Bill are sole officers and directors and only they are
authorized to enter into oral or written contracts for the purpose of
purchasing or renting any type of goods or services.  However, there was no evidence that this
resolution was ever filed in the public records. 








Kwik Kar is partitioned into
two separate areas:  the service bay and
the business office.  Sandy worked in the
business area of Kwik Kar, typically performing her duties in her office and
behind the cash register. 

In early 2001, Kwik Kar was
looking to employ a uniform and linen service company.  Kwik Kar was introduced to Mission through
one of its customers, who was also a Mission employee.  Because Sandy categorized dealing with
uniform and linen services as a shop area responsibility, she allowed Phil
Elliot to speak to the Mission representative. 
At that time Elliot was employed as the shop manager of Kwik Kar and had
the responsibility of supervising employees in the service bay.  Although Elliot was allowed to accept
deliveries of supplies he was not allowed to place orders of such supplies.

On March 20, 2001, Elliot
signed a rental services agreement with Mission to be Kwik Kar=s exclusive supplier and launderer of service uniforms, shop towels,
and floor mats for five years.  Elliot
signed the rental agreement as Kwik Kar=s manager.  Paragraphs 6 and 7
of the rental agreement provided as follows: 









6.  Should CUSTOMER believe that MISSION has
failed to provide service in accordance with the standard and quality
comparable to that of other commercial laundries rendering like service in the
same area, it shall notify MISSION in writing by certified mail, setting forth
the specific nature of the complaint. 
Should Mission in its discretion find such complaint to be valid but
then fail to remedy the complaint within thirty (30) days, CUSTOMER may terminate
the Agreement by giving sixty (60) days= notice to MISSION in writing
and by purchasing all special items in issue and/or in inventory at the then
current replacement value.    

 

7.  In the event of cancellation for any reason
as set forth in Paragraph 6, CUSTOMER agrees to (a) purchase the entire
inventory of items in service or otherwise held for CUSTOMER=S
use, at current replacement costs if new, less 30% if used, (b) pay all
outstanding amounts owed to Mission, and (c) pay, as liquidated damages and not
as penalty, 50% of the average weekly amounts invoiced during the month
preceding the breech, multiplied by the number of weeks remaining in the terms
of the agreement, beginning with the date of the breach.  CUSTOMER further agrees to pay all costs
Mission may incur to enforce CUSTOMER=s obligations under this
agreement, including reasonable attorneys= fees.

 

The day after the rental
agreement was signed, Mission faxed a credit application to Kwik Kar, including
a guaranty, in order to set up a charge account with Mission.  Sandy completed and signed the application on
behalf of Kiwk Kar and also signed in her individual capacity as a personal
guarantor.  Moreover, Sandy testified
that she understood that signing obligated her to personally pay for an
indebtedness incurred to Mission as a result of it providing products and
services to Kiwk Kar.  The credit
application did not, however, make any reference to the rental agreement or
otherwise indicate an exclusive five-year relationship.








Over the following two and a
half years, Mission supplied and laundered uniforms, towels, and mats for Kwik
Kar on a weekly basis.  The services to
be provided under the rental agreement were modified as new employee orders
were added and additional garments were purchased.  Information necessary for ordering uniforms
and linens, including changing orders and providing authorization for pricing
specific services, was typically provided by somebody other than Sandy.  Although Sandy did not directly authorize or
change the orders, and even though she was not always satisfied with Mission=s services, Sandy paid each of Kwik Kar=s balances totaling approximately $12,000 over course of the parties= relationship.

On April 28, 2003, after
paying for twenty-five months of services from Mission, Kwik Kar notified
Mission by letter that it was terminating their relationship.  Moreover, the letter indicated that Sandy and
Bill had only recently discovered the rental agreement signed by Elliot and
claimed that Elliot had not been authorized to sign the agreement and as such
it was invalid.  This was the first
written complaint Mission had received from Kwik Kar.

After receiving the April 28
letter, Mission attempted to discuss any problems with its services with
Sandy.  Mission=s general manager made two trips to Kwik Kar but was unable to contact
Sandy.  The general manager left his
business card on one of these visits.








On July 8, 2003, Mission
forwarded a letter to Kwik Kar to attempt to resolve any problems regarding
Mission=s products and services. 
Mission also notified Kwik Kar that its refusal to honor the rental
agreement entitled Mission to enforce its rights under the cancellation
provisions of the rental agreement unless Kwik Kar resumed service.  In conjunction with the July 8 letter,
Mission also sent an early termination worksheet detailing, pursuant to
paragraph 7 of the rental agreement, amounts purportedly owed by Kiwk Kar as a
result of the early termination. 
According to the worksheet, Kwik Kar owed Mission liquidated damages of
$5,479.65 for terminating the rental agreement with ninety-nine weeks still
remaining on the contract.

On July 25, 2005, Mission
filed its original petition in Hood County. 
Mission sought judgment for the $5,479.65 debt, attorneys= fees, and applicable interest. 
Mission also sought judgment against Sandy individually for her
obligations as personal guarantor of the Aoutstanding balance@ due Mission on the rental agreement.

On April 10, 2006, Sandy
filed an original counterclaim against Mission for attorneys= fees and the costs of litigation pursuant to the terms of the
guaranty provisions of the credit application. 
Kwik Kar and Sandy then filed their first amended answer on July 27,
2006, and claimed the liquidated damages provision of the rental agreement was
unenforceable as a penalty. 








After a bench trial, final
judgment was that Mission take nothing on its claim, that Sandy take nothing on
her counterclaim, and that each party bear its own costs.  On December 11, 2006, the trial court filed
its findings of fact and conclusions of law. 
This appeal followed.  

III. Standards of Review

Findings of fact entered in a case tried to the court have
the same force and dignity as a jury=s answers to jury
questions.  Anderson v. City of Seven
Points, 806 S.W.2d 791, 794 (Tex. 1991). 
The trial court=s findings of fact are reviewable for
legal and factual sufficiency of the evidence to support them by the same
standards that are applied in reviewing evidence supporting a jury=s answer.  Ortiz v. Jones, 917 S.W.2d 770, 772
(Tex. 1996); Catalina v. Blasdel, 881 S.W.2d 295, 297 (Tex. 1994).








A legal sufficiency challenge may only be sustained when
(1) the record discloses a complete absence of evidence of a vital fact, (2)
the court is barred by rules of law or of evidence from giving weight to the
only evidence offered to prove a vital fact, (3) the evidence offered to prove
a vital fact is no more than a mere scintilla, or (4) the evidence establishes
conclusively the opposite of a vital fact. 
Uniroyal Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334 (Tex.
1998), cert. denied, 526 U.S. 1040 (1999);
Robert W. Calvert, "No Evidence" and "Insufficient
Evidence" Points of Error, 38 TEX. L. REV. 361, 362-63 (1960).  In
determining whether there is legally sufficient evidence to support the finding
under review, we must consider evidence favorable to the finding if a
reasonable fact-finder could, and disregard evidence contrary to the finding
unless a reasonable fact-finder could not. 
City of Keller v. Wilson, 168 S.W.3d
802, 827
(Tex. 2005). 

An assertion that the
evidence is factually insufficient to support a fact finding means that the
evidence supporting the finding is so weak or the evidence to the contrary is
so overwhelming that the answer should be set aside and a new trial
ordered.  Garza v. Alviar, 395
S.W.2d 821, 823 (Tex. 1965).  We are
required to consider all of the evidence in the case in making this
determination, not just the evidence that supports the finding.  Mar. Overseas Corp. v. Ellis, 971
S.W.2d 402, 406B07 (Tex.), cert.
denied, 525 U.S. 1017 (1998).

IV. Apparent Authority

In its first issue, Mission
claims the trial court erred by finding that Elliot did not have apparent
authority when he signed the rental agreement as Kwik Kar=s manager.  We disagree.     

A. Applicable Law 








Apparent authority requires
(1) a reasonable belief in the agent=s authority, (2) generated by some holding out or neglect of the
principal, and (3) justifiable reliance on the authority.  2616 S. Loop L.L.C. v. Health Source Home
Care, Inc., 201 S.W.3d 349, 356 (Tex. App.CHouston [14th Dist.] 2006, no pet.). 
Stated another way, apparent authority arises through acts of
participation, knowledge, or acquiescence by the principal that clothe the
agent with the indicia of apparent authority. 
Ins. Co. of N. Am. v. Morris, 981 S.W.2d 667, 672 (Tex.
1998).    








In determining whether
apparent authority exists, a court looks to the acts of the principal and ascertains
whether those acts would lead a reasonably prudent person using diligence and
discretion to suppose the agent had the authority to act on behalf of the
principal.  Suarez v. Jordan, 35
S.W.3d 268, 272B73 (Tex.
App.CHouston [14th Dist.] 2000, no pet.). 
Furthermore, a court may consider only the conduct of the principal
leading a third party to believe that the agent has authority in determining
whether an agent has apparent authority. 
NationsBank, N.A. v. Dilling, 922 S.W.2d 950, 953 (Tex.
1996).  AThe principal must have affirmatively held out the agent as possessing
the authority or must have knowingly and voluntarily permitted the agent to act
in an unauthorized manner.@  Id.  Thus, representations made by the agent of
his authority have no effect.  Huynh
v. Nguyen, 180 S.W.3d 608, 623 (Tex. App.CHouston [14th Dist.] 2005, no pet.). 
Lastly, the burden of proof is on the party relying on the doctrine of
apparent authority to bind a principal to prove facts that will establish
apparent authority.  Shippers= Compress Co. v. N. Assurance Co., 208
S.W. 939, 947 (Tex. Civ. App.CBeaumont 1919, writ ref=d).  

B. Analysis 

Mission cites us to several
pieces of evidence that it believes would lead a reasonably prudent person to
believe that Elliot had authority to sign the rental agreement.  This evidence includes the following:

$                  
Kwik Kar designated Elliot as Ashop
manager@;

 

$                  
Sandy had Elliot speak with the Mission
representative;

 

$                                                                  
Kwik Kar=s awareness that uniforms
were being provided by Mission;    

 

$                  
Sandy and Bill often were physically absent from
Kwik Kar, which left Elliot in a position of authority as the highest ranking
employee present;

 

$                  
Industry custom was for shop managers to sign
this type of rental agreement;

 

$                  
Sandy completed, signed, and submitted the credit
application and guaranty provision sent by Mission;

 

$                  
Kwik Kar routinely received and paid the services
provided by Mission for more than two years;

 

$                  
Kwik Kar shop managers modified the services
under the rental agreement; and

 

$                  
Sandy testified that she communicated to Mission
that she had not received Aall of [the] service
agreement stuff.@   








We first note that only the
actions of the principal, in this case Sandy or Kwik Kar, are relevant in
determining whether Elliot had apparent authority.  See NationsBank, 922 S.W.2d at
953.  Thus, the evidence that it was
customary in the industry for shop managers to sign this type of agreement cannot
be considered because it has nothing to do with the actions or inactions of the
principal.  See id.   

Next, we recognize that
Mission was required to prove that it knew about the facts giving color to
Elliot=s alleged agency at the time it dealt with Kwik Kar.  See BML Stage Lighting, Inc. v. Mayflower
Transit, Inc., 14  S.W.3d 395, 401
(Tex. App.CHouston
[14th Dist.] 2000, pet. denied). 
Ratification or estoppel are not in issue here.  At the time Mission dealt with Kwik Kar, i.e.
when Elliot signed the rental agreement, the only evidence Mission was aware of
was that Elliot had the title of shop manager, Sandy allowed Elliot to speak with
the Mission representative, and perhaps that Sandy and Bill were often not
physically present at Kwik Kar.  








The mere fact that Elliot
held the title of shop manager or that Sandy and Bill were not always present
at Kwik Kar does not necessarily indicate that Elliot would appear to have the
authority to bind Kwik Kar to a multi-year contract.  Furthermore, it is plausible that Sandy
allowed Elliot to talk to the Mission representative simply because the goods
and services to be provided by Mission would be used in the service bay
area.  

All of the remaining evidence
Mission points us to occurred after Elliot had signed the rental
agreement.  Thus, that evidence would not
be relevant to whether Elliot had the appearance of authority when he signed
the rental agreement.  Further, because
those actions took place subsequent to Elliot signing the rental agreement we
fail to see how Mission could have relied on them to conclude that Elliot
possessed authority to sign.     

We cannot say that the
evidence Mission was aware of at the time Elliot signed the rental agreement
would generate a reasonable belief of Elliot=s authority in a reasonably prudent person using diligence and
discretion.  See 2616 S. Loop,
201 S.W.3d at 356; Suarez, 35 S.W.3d at 272B73.  Here, the evidence
offered to prove that Elliot had apparent authority was no more than a mere
scintilla.  See Uniroyal, 977
S.W.2d at 334. 
Consequently, the elements of apparent authority were not met.  After considering the evidence favorable to
the trial court=s finding
and disregarding contrary evidence, we hold that there was legally sufficient
evidence to support the finding that Elliot did not have apparent authority
when he signed the rental agreement.  See City of Keller, 168 S.W.3d at 827.         








  Likewise, after considering all
of the evidence relating to the trial court=s finding, we cannot say that the evidence supporting the finding is
so weak or the evidence to the contrary is so overwhelming that the answer
should be set aside and a new trial ordered. 
See Mar. Overseas Corp., 971 S.W.2d at 406B07; Garza, 395 S.W.2d at 823. 
Therefore, we hold that there was factually sufficient evidence to
support the trial court=s
ruling.  As a result, we overrule Mission=s first issue.  

In its second issue, Mission
argues that the liquidated damages provision of the rental agreement is
enforceable.  However, because Elliot
lacked apparent authority to execute the rental agreement, this provision
cannot be enforced against Kwik Kar or Sandy. 
Accordingly, we overrule Mission=s second issue.

In its third issue, Mission
asserts that it is entitled to recover on its claims against Kwik Kar and
Sandy.  The only claim of damages Mission
had was based on the liquidated damages provision of the rental agreement.  As discussed above, the rental agreement was
not enforceable against Kwik Kar nor Sandy. 
Therefore, Mission is not entitled to recover on its claims.  Hence, we overrule Mission=s final issue.      

 

 








V. Conclusion

Having overruled all of
Mission=s issues, we affirm the trial court=s judgment.            

 

 

BOB MCCOY

JUSTICE

 

PANEL A:   LIVINGSTON, HOLMAN, and MCCOY, JJ.

 

DELIVERED:
July 26, 2007











[1]See Tex. R. App. P. 47.4.