COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-07-014-CV

MISSION LINEN SUPPLY, INC. APPELLANT

V.

SANDY’S SIGNALS, INC. APPELLEES

D/B/A KWIK KAR & LUBE OF 

GRANBURY AND SAUNDRA 

SCHAAD, INDIVIDUALLY 

------------

FROM COUNTY COURT AT LAW OF HOOD COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I. Introduction 

In three issues, Appellant Mission Linen Supply, Inc. (“Mission”) appeals the trial court’s finding that Phillip Elliott did not possess apparent authority and its finding that the liquidated damages provision of the rental service contract was unenforceable as a penalty.  We affirm.    

II.  Factual and Procedural Background

This is the case of the liquidated linens.

Mission operates two uniform and textile rental services plants in Texas, as well as a depot.  Appellees Sandy’s Signals, Inc. d/b/a Kwik Kar & Lube of Granbury (“Kwik Kar”) and Saundra (“Sandy”) Schaad are in the business of changing oil and providing maintenance for automobiles.  Sandy serves as the president and owner of the business and her husband William (“Bill”) Schaad serves as the vice president and treasurer.

Kwik Kar’s assumed name certificate states that Sandy is the sole owner of Kwik Kar.  Moreover, the plaques and business cards displayed inside Kwik Kar indicate that Sandy and Bill are the sole proprietors of the business.  There was also a corporate resolution executed at the time of incorporation that states that Sandy and Bill are sole officers and directors and only they are authorized to enter into oral or written contracts for the purpose of purchasing or renting any type of goods or services.  However, there was no evidence that this resolution was ever filed in the public records. 

Kwik Kar is partitioned into two separate areas:  the service bay and the business office.  Sandy worked in the business area of Kwik Kar, typically performing her duties in her office and behind the cash register. 

In early 2001, Kwik Kar was looking to employ a uniform and linen service company.  Kwik Kar was introduced to Mission through one of its customers, who was also a Mission employee.  Because Sandy categorized dealing with uniform and linen services as a shop area responsibility, she allowed Phil Elliot to speak to the Mission representative.  At that time Elliot was employed as the shop manager of Kwik Kar and had the responsibility of supervising employees in the service bay.  Although Elliot was allowed to accept deliveries of supplies he was not allowed to place orders of such supplies.

On March 20, 2001, Elliot signed a rental services agreement with Mission to be Kwik Kar’s exclusive supplier and launderer of service uniforms, shop towels, and floor mats for five years.  Elliot signed the rental agreement as Kwik Kar’s manager.  Paragraphs 6 and 7 of the rental agreement provided as follows:  

6.  Should CUSTOMER believe that MISSION has failed to provide service in accordance with the standard and quality comparable to that of other commercial laundries rendering like service in the same area, it shall notify MISSION in writing by certified mail, setting forth the specific nature of the complaint.  Should Mission in its discretion find such complaint to be valid but then fail to remedy the complaint within thirty (30) days, CUSTOMER may terminate the Agreement by giving sixty (60) days’ notice to MISSION in writing and by purchasing all special items in issue and/or in inventory at the then current replacement value.    

7.  In the event of cancellation for any reason as set forth in Paragraph 6, CUSTOMER agrees to (a) purchase the entire inventory of items in service or otherwise held for CUSTOMER’S use, at current replacement costs if new, less 30% if used, (b) pay all outstanding amounts owed to Mission, and (c) pay, as liquidated damages and not as penalty, 50% of the average weekly amounts invoiced during the month preceding the breech, multiplied by the number of weeks remaining in the terms of the agreement, beginning with the date of the breach.  CUSTOMER further agrees to pay all costs Mission may incur to enforce CUSTOMER’s obligations under this agreement, including reasonable attorneys’ fees.

The day after the rental agreement was signed, Mission faxed a credit application to Kwik Kar, including a guaranty, in order to set up a charge account with Mission.  Sandy completed and signed the application on behalf of Kiwk Kar and also signed in her individual capacity as a personal guarantor.  Moreover, Sandy testified that she understood that signing obligated her to personally pay for an indebtedness incurred to Mission as a result of it providing products and services to Kiwk Kar.  The credit application did not, however, make any reference to the rental agreement or otherwise indicate an exclusive five-year relationship.

Over the following two and a half years, Mission supplied and laundered uniforms, towels, and mats for Kwik Kar on a weekly basis.  The services to be provided under the rental agreement were modified as new employee orders were added and additional garments were purchased.  Information necessary for ordering uniforms and linens, including changing orders and providing authorization for pricing specific services, was typically provided by somebody other than Sandy.  Although Sandy did not directly authorize or change the orders, and even though she was not always satisfied with Mission’s services, Sandy paid each of Kwik Kar’s balances totaling approximately $12,000 over course of the parties’ relationship.

On April 28, 2003, after paying for twenty-five months of services from Mission, Kwik Kar notified Mission by letter that it was terminating their relationship.  Moreover, the letter indicated that Sandy and Bill had only recently discovered the rental agreement signed by Elliot and claimed that Elliot had not been authorized to sign the agreement and as such it was invalid.  This was the first written complaint Mission had received from Kwik Kar.

After receiving the April 28 letter, Mission attempted to discuss any problems with its services with Sandy.  Mission’s general manager made two trips to Kwik Kar but was unable to contact Sandy.  The general manager left his business card on one of these visits.

On July 8, 2003, Mission forwarded a letter to Kwik Kar to attempt to resolve any problems regarding Mission’s products and services.  Mission also notified Kwik Kar that its refusal to honor the rental agreement entitled Mission to enforce its rights under the cancellation provisions of the rental agreement unless Kwik Kar resumed service.  In conjunction with the July 8 letter, Mission also sent an early termination worksheet detailing, pursuant to paragraph 7 of the rental agreement, amounts purportedly owed by Kiwk Kar as a result of the early termination.  According to the worksheet, Kwik Kar owed Mission liquidated damages of $5,479.65 for terminating the rental agreement with ninety-nine weeks still remaining on the contract.

On July 25, 2005, Mission filed its original petition in Hood County.  Mission sought judgment for the $5,479.65 debt, attorneys’ fees, and applicable interest.  Mission also sought judgment against Sandy individually for her obligations as personal guarantor of the “outstanding balance” due Mission on the rental agreement.

On April 10, 2006, Sandy filed an original counterclaim against Mission for attorneys’ fees and the costs of litigation pursuant to the terms of the guaranty provisions of the credit application.  Kwik Kar and Sandy then filed their first amended answer on July 27, 2006, and claimed the liquidated damages provision of the rental agreement was unenforceable as a penalty. 

After a bench trial, final judgment was that Mission take nothing on its claim, that Sandy take nothing on her counterclaim, and that each party bear its own costs.  On December 11, 2006, the trial court filed its findings of fact and conclusions of law.  This appeal followed.  

III. Standards of Review

Findings of fact entered in a case tried to the court have the same force and dignity as a jury’s answers to jury questions.  
Anderson v. City of Seven Points
, 806 S.W.2d 791, 794 (Tex. 1991).  The trial court’s findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury’s answer.  
Ortiz v. Jones,
 917 S.W.2d 770, 772 (Tex. 1996); 
Catalina v. Blasdel,
 881 S.W.2d 295, 297 (Tex. 1994).

A legal sufficiency challenge may only be sustained when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact.  
Uniroyal Goodrich Tire Co. v. Martinez
, 977 S.W.2d 328, 334 (Tex. 1998),
 cert. denied
, 526 U.S. 1040 (1999);
 Robert W. Calvert, 
"No Evidence"
 
and "Insufficient Evidence" Points of Error
, 38 T
EX
. L. R
EV
. 361, 362-63 (1960)
.  
In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable fact-finder could, and disregard evidence contrary to the finding unless a reasonable fact-finder could not.
  
City of Keller v. Wilson
, 
168 S.W.3d 802, 827
 (Tex. 2005). 

An assertion that the evidence is factually insufficient to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered.  
Garza v. Alviar
, 395 S.W.2d 821, 823 (Tex. 1965).  We are required to consider all of the evidence in the case in making this determination, not just the evidence that supports the finding.  
Mar. Overseas Corp. v. Ellis
, 971 S.W.2d 402, 406–07 (Tex.), 
cert. denied
, 525 U.S. 1017 (1998).

IV. Apparent Authority

In its first issue, Mission claims the trial court erred by finding that Elliot did not have apparent authority when he signed the rental agreement as Kwik Kar’s manager.  We disagree.     

A. Applicable Law 

Apparent authority requires (1) a reasonable belief in the agent’s authority, (2) generated by some holding out or neglect of the principal, and (3) justifiable reliance on the authority.  
2616 S. Loop L.L.C. v. Health Source Home Care, Inc.
, 201 S.W.3d 349, 356 (Tex. App.—Houston [14th Dist.] 2006, no pet.).  Stated another way, apparent authority arises through acts of participation, knowledge, or acquiescence by the principal that clothe the agent with the indicia of apparent authority.  
Ins. Co. of N. Am. v. Morris
, 981 S.W.2d 667, 672 (Tex. 1998).    

In determining whether apparent authority exists, a court looks to the acts of the principal and ascertains whether those acts would lead a reasonably prudent person using diligence and discretion to suppose the agent had the authority to act on behalf of the principal.  
Suarez v. Jordan
, 35 S.W.3d 268, 272–73 (Tex. App.—Houston [14th Dist.] 2000, no pet.).  Furthermore, a court may consider only the conduct of the principal leading a third party to believe that the agent has authority in determining whether an agent has apparent authority.  
NationsBank, N.A. v. Dilling
, 922 S.W.2d 950, 953 (Tex. 1996).  “The principal must have affirmatively held out the agent as possessing the authority or must have knowingly and voluntarily permitted the agent to act in an unauthorized manner.”  
Id.
  Thus, representations made by the agent of his authority have no effect.  
Huynh v. Nguyen
, 180 S.W.3d 608, 623 (Tex. App.—Houston [14th Dist.] 2005, no pet.).  Lastly, the burden of proof is on the party relying on the doctrine of apparent authority to bind a principal to prove facts that will establish apparent authority.  
Shippers’ Compress Co. v. N. Assurance Co.
, 208 S.W. 939, 947 (Tex. Civ. App.—Beaumont 1919, writ ref’d).  

B. Analysis 

Mission cites us to several pieces of evidence that it believes would lead a reasonably prudent person to believe that Elliot had authority to sign the rental agreement.  This evidence includes the following:

Kwik Kar designated Elliot as “shop manager”;

Sandy had Elliot speak with the Mission representative;

Kwik Kar’s awareness that uniforms were being provided by Mission; 

Sandy and Bill often were physically absent from Kwik Kar, which left Elliot in a position of authority as the highest ranking employee present;

Industry custom was for shop managers to sign this type of rental agreement;

Sandy completed, signed, and submitted the credit application and guaranty provision sent by Mission;

Kwik Kar routinely received and paid the services provided by Mission for more than two years;

Kwik Kar shop managers modified the services under the rental agreement; and

Sandy testified that she communicated to Mission that she had not received “all of [the] service agreement stuff.”   

We first note that only the actions of the principal, in this case Sandy or Kwik Kar, are relevant in determining whether Elliot had apparent authority.  
See
 
NationsBank
, 922 S.W.2d at 953.  Thus, the evidence that it was customary in the industry for shop managers to sign this type of agreement cannot be considered because it has nothing to do with the actions or inactions of the principal.  
See id.
   

Next, we recognize that Mission was required to prove that it knew about the facts giving color to Elliot’s alleged agency 
at the time 
it dealt with Kwik Kar.  
See BML Stage Lighting, Inc. v. Mayflower Transit, Inc.
, 14  S.W.3d 395, 401 (Tex. App.—Houston [14th
 Dist.] 2000, pet. denied).  Ratification or estoppel are not in issue here.  At the time Mission dealt with Kwik Kar, i.e. when Elliot signed the rental agreement, the only evidence Mission was aware of was that Elliot had the title of shop manager, Sandy allowed Elliot to speak with the Mission representative, and perhaps that Sandy and Bill were often not physically present at Kwik Kar.  

The mere fact that Elliot held the title of shop manager or that Sandy and Bill were not always present at Kwik Kar does not necessarily indicate that Elliot would appear to have the authority to bind Kwik Kar to a multi-year contract.  Furthermore, it is plausible that Sandy allowed Elliot to talk to the Mission representative simply because the goods and services to be provided by Mission would be used in the service bay area.  

All of the remaining evidence Mission points us to occurred 
after
 Elliot had signed the rental agreement.  Thus, that evidence would not be relevant to whether Elliot had the appearance of authority when he signed the rental agreement.  Further, because those actions took place subsequent to Elliot signing the rental agreement we fail to see how Mission could have relied on them to conclude that Elliot possessed authority to sign.     

We cannot say that the evidence Mission was aware of at the time Elliot signed the rental agreement would generate a reasonable belief of Elliot’s authority in a reasonably prudent person using diligence and discretion.  
See
 
2616 S. Loop
, 201 S.W.3d at 356; 
Suarez
, 35 S.W.3d at 272–73.  
Here, the evidence offered to prove that Elliot had apparent authority was no more than a mere scintilla.  
See 
Uniroyal
, 977 S.W.2d at 334.
  Consequently, the elements of apparent authority were not met.  After considering the evidence favorable to the trial court’s finding and disregarding contrary evidence, we hold that there was legally sufficient evidence to support the finding that Elliot did not have apparent authority when he signed the rental agreement.  
See City of Keller
, 
168 S.W.3d at 827.         

 
 Likewise, after considering all of the evidence relating to the trial court’s finding, we cannot say that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered.  
See Mar. Overseas Corp.
, 971 S.W.2d at 406–07; 
Garza
, 395 S.W.2d at 823.  Therefore, we hold that there was factually sufficient evidence to support the trial court’s ruling.  As a result, we overrule Mission’s first issue.  

In its second issue, Mission argues that the liquidated damages provision of the rental agreement is enforceable.  However, because Elliot lacked apparent authority to execute the rental agreement, this provision cannot be enforced against Kwik Kar or Sandy.  Accordingly, we overrule Mission’s second issue.

In its third issue, Mission asserts that it is entitled to recover on its claims against Kwik Kar and Sandy.  The only claim of damages Mission had was based on the liquidated damages provision of the rental agreement.  As discussed above, the rental agreement was not enforceable against Kwik Kar nor Sandy.  Therefore, Mission is not entitled to recover on its claims.  Hence, we overrule Mission’s final issue.      

V. Conclusion

Having overruled all of Mission’s issues, we affirm the trial court’s judgment.            

BOB MCCOY

JUSTICE

PANEL A: LIVINGSTON, HOLMAN, and MCCOY, JJ.

DELIVERED: July 26, 2007

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.